622 So.2d 198 (1993)
STATE of Louisiana
v.
Scott Jude BOURQUE.
No. 92-KA-0968.
Supreme Court of Louisiana.
July 1, 1993.
Rehearings Denied September 2, 1993.
*208 Thomas E. Guilbeau, Lafayette, for applicant.
Richard P. Ieyoub, Atty. Gen., New Orleans, Bernard E. Boudreaux, Jr., Dist. Atty., Franklin, John P. Haney, Haney, Akers, & Segura, New Iberia, for respondent.
KIMBALL, Justice[*].
A St. Martin Parish grand jury indicted Scott Jude Bourque for the first degree murder of his estranged girlfriend, Charlotte Perry, in violation of LSA-R.S. 14:30. After trial by jury, the defendant was found guilty as charged and unanimously sentenced to death after two aggravating circumstances were found. The trial judge sentenced defendant to death in accordance with the recommendation of the jury. This is the direct appeal of his conviction and sentence.
On appeal, Bourque relies on seventy-seven (77) assignments of error for the reversal of his conviction and sentence, fifty-three (53) of which have been briefed.[1] *209 Although we find no error was committed in the guilt phase of the trial, and affirm the defendant's conviction, we find an arbitrary factor may have been injected into the penalty phase of the trial, mandating that we vacate the sentence of death and remand for a new sentencing hearing.

FACTS
The following facts were adduced in the guilt phase of the defendant's trial. On March 17, 1990, Kenneth Perry received a telephone call from his twenty-eight year old daughter, Charlotte. Ms. Perry told her father the defendant had taken her from her place of employment, as he had done on a prior occasion. When he learned this, Mr. Perry drove to Scott Bourque's trailer in Kaplan, Louisiana, to retrieve his daughter and some of her belongings. Charlotte Perry and the defendant had had a prior relationship but had broken up a few months earlier.
When he arrived, Mr. Perry saw Ms. Perry outside the trailer and spoke to her briefly. The defendant approached and told the two Perrys he wanted them to accompany him to Holly Beach. When Mr. Perry declined, the defendant became abusive, using foul language toward Ms. Perry. The defendant threatened to kill Ms. Perry and her father.
The defendant continued to curse Ms. Perry and threatened to shoot both Perrys while he walked back to his trailer. He stated that if they left, he would burn all of Ms. Perry's belongings. After conferring with his daughter, and learning of her desire to retrieve a camera and dress the defendant had in his trailer, Mr. Perry walked up to the trailer. While talking to the defendant, Mr. Perry noticed the barrel of a gun held by the defendant. He told his daughter to get in his car, and the two Perrys drove away.
Terry Loignon, the owner of The Barn Lounge in Gueydan, Louisiana, saw the defendant in his bar about a month later, on the evening of April 15, 1990. Loignon first saw the defendant in the bar between 9 p.m. and 10 p.m. Loignon knew the defendant owned a nickel-plated 9 MM pistol and a shotgun, and he saw the pistol in the defendant's possession that night. Cheryl Oberg, the bartender at The Barn Lounge that evening, served the defendant a single shot of Tequila around 10 p.m. Both Loignon and Oberg observed the defendant was speaking and walking normally. The defendant left the bar at approximately 10 to 10:30 p.m.
April 15, 1990 was Easter Sunday and Theresa Stoute, her daughter Charlotte Perry, her oldest son Kenny Paul Perry, and her friend Carroll Romero were at her residence in St. Martinville, Louisiana in the early evening. Ms. Perry had lived at home since January 30, 1990.
While eating dinner about 7:30 p.m., the telephone rang. Because Ms. Perry had been receiving threatening calls from the defendant, Mrs. Stoute routinely answered the phone. When Mrs. Stoute answered the call, the defendant told her, "Ms. Perry, tell Charlotte I love her and I love you." Mrs. Stoute told the defendant she would do so and hung up the phone.
Later, as the family cleaned up the kitchen, the phone rang again. This time the defendant told Mrs. Stoute, "Ms. Perry, tell Charlotte I love her very much and this is the last day of my life." The defendant had said similar things in the past to Mrs. Stoute. Ms. Perry seemed distressed after being told of the call.
Kenny Paul Perry left the house between 10 p.m. and 10:30 p.m. that evening. Ms. Perry took a bath while her mother and Carroll Romero went into a bedroom to watch television. At approximately 11 p.m., Ms. Perry's seventeen year old brother, Michael, came home. Mrs. Stoute talked to her two children in the kitchen, but soon returned to the bedroom where she fell into a light sleep.
*210 Soon thereafter, Michael Perry moved to answer a knock at the back door while Ms. Perry, who was in a nightgown, began to walk down the hall. The defendant was at the door. Without saying a word to Michael, the defendant walked past him toward the hall where he saw Ms. Perry. Michael saw the defendant had a shotgun with a pistol grip and heard him command, "Charlotte, come here."
Michael grabbed his keys, closed the door, and ran outside to get help. He drove his car to a nearby police station and told the officer on duty that there was a man with a gun in his house who would probably use it. After relaying his address, Michael jumped back in his car to go home.
Meanwhile, Mrs. Stoute was awakened from her light sleep by scrambling sounds in the hallway in front of her room. She opened her bedroom door and saw the defendant pulling her daughter down the hall. Mrs. Stoute yelled at the defendant that he couldn't do this to her daughter, then grabbed on to Ms. Perry and tried to keep the defendant from taking her. Because the two women were smaller, the defendant pulled both women down the hall and into the den.
As the group passed the kitchen counter and entered the brighter light of the kitchen, Mrs. Stoute was able to see a shotgun in the defendant's right hand and that his finger was on the trigger. Mrs. Stoute looked at the defendant just as he raised the shotgun, placing it at Mrs. Stoute's throat.
Acting instinctively, Mrs. Stoute grabbed the barrel of the shotgun and pushed it away toward her shoulder, as the defendant pulled the trigger. Mrs. Stoute heard her daughter scream while she was spun around by the blast, falling face down on the floor. Right before the defendant pulled Ms. Perry out of the door, Mrs. Stoute heard her say, "No, Scotty, no, no, I don't want to go." Mrs. Stoute, still conscious, tried to rise from the floor to follow but was unable to do so. When she turned her head and looked at her left hand, she saw her thumb had been shot off. She believed she was going to die.
Awakened by the noise in the hall and the shotgun blast, Carroll Romero walked down the hall to find Mrs. Stoute face down and bleeding on the floor. He saw the defendant's back retreating out the back door and although he could hear Ms. Perry, he could not see her. Romero did not know if Mrs. Stoute was alive until she spoke, telling him the defendant had shot her and had taken her daughter. Romero told Mrs. Stoute not to get up because she was bleeding and called an ambulance. He ran into the kitchen and brought back a kitchen towel to wrap her hand; he also obtained a blanket because Mrs. Stoute was shivering. Because Mrs. Stoute also feared for her son, Michael, whom she had not seen, Romero walked to the edge of the porch.
From that vantage point, Romero saw the defendant trying to force Ms. Perry toward his white, Chevy Corsica four-door sedan. Ms. Perry was fighting back to keep from going into the car, all the while begging the defendant to let her go. Romero reentered the house and called Ms. Perry's grandfather. He then heard a shot and went outside.
Michael Perry, who had just returned from the police station and had parked his car directly across the street from his house, saw the defendant just as he was forcing Ms. Perry out of the house. Michael saw his sister resisting the whole way. When they were about 10 feet from the defendant's car, the defendant could force Ms. Perry to go no further. At that point, the defendant let Ms. Perry go and shot her with his 9 MM pistol. Michael exited his car and started toward his sister. When the defendant looked over at the brother, Michael retreated back to his car. As soon as Michael retreated, the defendant walked back to Ms. Perry, raised the pistol, and shot her three more times as she lay on the ground. The defendant then ran to his car, put the two weapons in the back seat, and sped away.
By the time Romero came outside again, the defendant was walking back to Ms. *211 Perry. Romero saw the defendant use both hands to point the pistol and shoot the victim as she lay on the ground. He saw the defendant speed away and noticed Michael Perry standing across the street.
Inside the house, Mrs. Stoute heard a shot, then three more shots. At the time, she believed the defendant had killed her children, Charlotte and Michael. Romero ran back into the house to comfort her.
Michael got into his car and followed the defendant to obtain the license number of the car the defendant was driving. He stopped at a gas station to write the number down, then went to his grandfather's house to tell him what had happened. After that, Michael drove home and found police officers at the scene.
Patrol Officer Cheryl Degeyter of the St. Martin Parish Sheriff's Office was the first officer on the scene. She checked Ms. Perry and found no pulse. After entering the house, she found Mrs. Stoute lying face down and called for an ambulance. When Michael came in, she questioned him. As a result of this information, she secured an arrest warrant for Scott Bourque.
Other sheriff's officers arrived. The crime scene was secured and Mrs. Stoute was transported by ambulance to the hospital. Spent shell casings were retrieved from the area around Ms. Perry's body. Shotgun pellets were found in the residence on the floor and in the walls, along with shot sleeve and wadding from a shotgun. This evidence, along with the clothing worn by the two women, and two bullets later recovered from Ms. Perry's body, was turned over to the Acadiana Crime Lab for analysis.
In the early morning hours of April 16, 1990, Ian Robinson, a photo journalist from England, was awakened by knocking at the door of the friend's apartment in Metairie, Louisiana, where he was staying. Robinson opened the door and saw the defendant, who asked if his friend was at home. Robinson told the defendant the friend was not there, but invited the defendant inside.
The defendant told Robinson, "I've got to get away, I've got to escape," then stated he had just shot or killed three people. Robinson, who had been trained as a social worker, believed he could handle the situation and attempted to calm the agitated defendant. He asked the defendant his name and talked to him. When the defendant asked for a drink, Robinson handed him a bottle of vodka. Before drinking the vodka, Robinson observed the defendant's speech and movements were normal.
Robinson noticed a pistol in the defendant's pants; the defendant later placed the pistol on the coffee table. Robinson attempted to make some phone calls to get help but was unsuccessful in reaching anyone on the first two calls. On the third call, Robinson reached the bartender of a nearby bar, Lefty's, but was unable to talk to him because the defendant was in the room. At some point, the defendant's pager went off and he made a telephone call. Robinson heard the defendant tell the other person that he was sorry, to look after his child, and that he would not be taken alive. The defendant also told the other party he would not see him again. The defendant indicated he knew he would "fry for this."
After this phone call, the defendant became nervous about staying at the apartment and wanted to leave. He indicated he wanted to take Robinson's car but Robinson convinced him his car was not working. The defendant related his plans to first get to his brother in eastern New Orleans, then flee the country. Robinson was to ditch the defendant's car later. The defendant told Robinson he had about $9000 in cash and showed him a large amount of money.
The two men left the apartment. When Robinson entered the defendant's car, he noticed a shotgun leaning against the passenger seat. Wishing to place the weapon as far away from the defendant as possible, Robinson placed the shotgun on the back seat and buried it under a bag of clothing. The defendant placed the pistol on the floorboard of the car on the driver's side.
When the men passed Lefty's bar, Robinson suggested stopping there for a drink and the defendant agreed. Both men ordered *212 a beer when the bartender came over but Robinson was unable to speak to him. At some point, Robinson was able to slip away to the bathroom and write a note alerting the bartender to the situation.
After reading the note, the bartender made Robinson aware that several off-duty police officers were in the bar. Robinson was able to signal them and two officers followed him into the bathroom. Once there, Robinson told the officers of the situation. One of the off-duty officers told another person to go across the street and call for assistance.
Robinson left the bar with the intention of hiding the pistol. He was unable to do this, however, because the defendant followed him and asked what he was doing. Robinson made an excuse; the defendant then locked his car doors and the men returned to the bar. Shortly thereafter, Jefferson Parish Sheriff's officers entered the bar, stated there was a problem with a white car in the parking lot, and asked who was the owner. The defendant admitted the car was his and followed the officers outside. Robinson followed the officers outside and observed the defendant talking to the officers for about a half hour with no difficulty.
Sgt. Norman Schultz of the Jefferson Parish Sheriff's Office (JPSO) responded to the call at the bar at 2:30 a.m. on April 16, 1990. He observed the 9 MM pistol and a bank bag lying on the floorboard of the defendant's locked car through the window. When the defendant emerged from the bar, JPSO Officer Richard Reggio advised him of his rights. Questioning ceased after the defendant indicated he wanted a lawyer. A pat down for weapons revealed several shotgun shells and over $8000 in cash. While being detained, the defendant made two inculpatory statements. At one point during his detention he stated, "Yeah, I did it, so what?" Later, while being placed in a police vehicle to wait, the defendant volunteered, "Oh, by the way, I killed three people tonight."
The defendant was detained for approximately forty-five minutes to an hour before the JPSO received confirmation from the St. Martin Parish Sheriff's Office that there was an arrest warrant for him. The defendant was arrested and transported to Jefferson Parish lock-up. His vehicle was secured with tape and towed to the Jefferson Parish impound lot. A search warrant was obtained for his car. The 9 MM pistol, a 12-gauge shotgun, a clothing bag, a small travel bag, empty 9 MM shell casings, and a box of shotgun shells were recovered from the vehicle. This evidence was transferred to the Acadiana Crime Lab.
At trial, the state introduced this evidence and the testimony of several experts. Dr. Emile Laga, the coroner for St. Martin Parish who performed the autopsy on Ms. Perry, was accepted as an expert in forensic pathology. He testified the cause of death was multiple gunshot wounds which caused massive bleeding and resulted in cardiac arrest.
He found a deep cut on the victim's right wrist. He found one bullet traveled through her left hand and into her head, lodging in the left side of her neck. This was a defensive wound, received when the victim raised her hand to protect herself. Although this wound was potentially fatal, it was not necessarily or immediately so. This bullet was recovered from the victim's body.
Another bullet entered the victim's body in the right chest, passed through a lung, and exited through the victim's back. No bullet was recovered for this wound. Dr. Laga testified a person would not die immediately from this wound.
Dr. Laga testified the fatal bullet entered the victim's left neck, traveled through the chest cavity into the abdominal cavity, tearing apart the heart and damaging the liver, and lodging in the muscles of the victim's back. This bullet was recovered from the victim's body. Dr. Laga testified this bullet was fired from a downward angle into the body.
Christopher Henderson of the Acadiana Crime Lab was accepted by the court as an expert in forensic chemistry, blood splatters, ballistics, and firearms. He testified *213 the pistol recovered from the defendant's car was a Smith and Wesson 9 MM semi-automatic pistol which contained one live cartridge in the chamber and three 9 MM cartridges in the magazine. Henderson determined the spent shell casings found outside the Stoute residence near the body of Ms. Perry had been fired from the pistol, as were the bullets removed from the victim's body during the autopsy. By comparing gun powder residue, Henderson was able to determine the bullet that entered the victim's right chest was fired from 6" to 24" away.
The shotgun seized from the defendant's car was a 12-gauge Revelation shotgun with one spent shell in the chamber and five live shells containing # 4 shot in the magazine. The spent shell had never been ejected from the gun; it was determined to be a Winchester Super X, three-inch magnum, 12-gauge shell which had contained # 4 shot. The shotgun pellets, shot sleeve and wadding recovered from inside the Stoute residence and the fragments recovered from Mrs. Stoute's shoulder were also # 4 shot.
Dr. Lawrence O. Broussard was accepted as an expert in the field of surgery. He had operated on Mrs. Stoute and described her injury as a gaping wound of the right shoulder, 8" × 5" in diameter, extending from the base of the neck to the tip of the shoulder. Although the major artery and vein had not been severed, Mrs. Stoute could have bled to death from her injuries had she not received prompt medical assistance. In addition, her left thumb had been shot away at the joint. Dr. Broussard testified a shotgun blast at the same distance to the throat area below the chin would have been immediately fatal.
The defense put on no witnesses during the guilt phase of the trial. The jury returned a unanimous verdict of guilty of first degree murder as charged.
At the penalty phase of the trial, the state reintroduced all the evidence presented at the guilt phase and additionally presented the testimony of twelve witnesses who would testify as to the defendant's character and propensities. Deputy Stan Suire of the Vermilion Parish Sheriff's Department testified that he investigated a complaint against the defendant made by Mr. Perry and his daughter on March 17, 1990. When he arrived at the defendant's residence to investigate the complaint, Deputy Suire found a small fire in which several of Ms. Perry's belongings were burning. The defendant was not at the residence.
The other eleven witnesses offered testimony to show the defendant killed a man named Jasper Fontenot at The Barn Lounge in Gueydan approximately one hour before he killed Ms. Perry at her mother's residence in St. Martinville.[2] Terry Loignon, the owner of the bar, testified the defendant entered the bar around 9 p.m. on April 15, 1990. The defendant asked Loignon if the man with whom he was playing pool was Jasper Fontenot and Loignon indicated this was so. Later, Loignon saw the defendant talking to Fontenot but stated the two men did not appear to be arguing. The defendant asked Loignon for permission to use Loignon's telephone at his nearby residence and left the bar to do so. He returned ten or fifteen minutes later and sat at the end of the bar.
A little while later, Loignon saw the defendant come around a corner of the bar, take out his pistol, and state, "I'll take care of this shit." As Loignon grabbed the defendant's hand, the gun fired into the floor.[3] When Loignon released the defendant's hand, the defendant pushed Loignon away and shot Fontenot. After hearing the defendant state, "That wasn't enough," Loignon saw the defendant fire two more shots at Fontenot. The defendant then turned and left the bar.
*214 Three other eyewitnesses testified they were in The Barn Lounge and saw the defendant shoot Jasper Fontenot. Four spent 9 MM casings and a bullet were recovered from the bar, as well as lead fragments in the ceiling.
Dr. Laga performed the autopsy on Jasper Fontenot. He testified the cause of death was a single gunshot wound to the chest. A bullet was recovered from Fontenot's body. This bullet and the other evidence recovered from the bar were turned over to the Acadiana Crime Lab.
Christopher Henderson testified the bullet recovered from the bar, the bullet recovered from Fontenot's body, and the four spent shell casings were fired from the 9 MM pistol recovered from the defendant's car in Jefferson Parish. No determination could be made from the lead fragments recovered from the bar's ceiling.
The defense presented evidence the defendant had spent a good portion of the day prior to the shootings drinking. The defendant's cousin, Marian Meaux, saw the defendant at Bennigan's Restaurant in Lafayette at noon on April 15, 1990. At that time, the defendant was drinking with a female friend. Meaux joined them and stayed at Bennigan's drinking for the entire afternoon until they left at 6 p.m. to go to another bar in Maurice, Louisiana. Their loud behavior in Bennigan's caused the manager to talk to them. Meaux testified both he and the defendant were intoxicated but stayed at the other bar until 9 p.m. The defendant was drinking Scotch all day with shots of Tequila every fifteen or twenty minutes. Meaux testified this was heavy drinking for the defendant. Meaux noticed the defendant's speech was not slurred but was rather loud. Meaux thought the defendant was walking normally.
The defense presented the testimony of the manager of Bennigan's, who confirmed the defendant had been drinking the afternoon of April 15, 1990. He noticed the defendant having a heated discussion at the bar with another person but was able to control the situation by talking to the two men. Although the manager stated the men had obviously been drinking, he did not think they were intoxicated.
A Jefferson Parish Sheriff's Office deputy who was working at the lock-up when the defendant was booked, testified he had marked on a booking sheet that the defendant appeared intoxicated. The booking sheet noted the defendant had the appearance and smelled of alcohol. The booking sheet also showed when asked if he had ever been hospitalized for drug abuse, the defendant informed the officer he had. The defense also presented the testimony of a prison drug rehabilitation therapist who stated the defendant had successfully completed a drug program in the parish prison and had subsequently become a tutor in the program.
The defendant's mother, Rita Durand, testified the defendant was her only child and that he had a thirteen year old daughter who lived with her mother and stepfather. The defendant's mother and father separated when the defendant was seven and a half years old. The defendant initially lived with his mother, but at thirteen began living with his maternal grandparents because his mother remarried and the defendant did not get along with his stepfather. He finished grammar school and up to the eleventh grade in high school in Kaplan, Louisiana, except for a short period when he attended a private school in Covington, Louisiana. Mrs. Durand stated the defendant had quite a few behavioral problems in school and was a discipline problem. After Mrs. Durand separated from her second husband, the defendant came to live with her for six months before returning to live with his grandparents. In fact, the trailer in Kaplan, Louisiana where the defendant lived before the shootings occurred was next door to his grandparent's house. Mrs. Durand had visited her son frequently.
Mrs. Durand testified the defendant had been unable to hold a job for long, although he had done parish road construction and had worked in various oilfield related jobs. The defendant had also worked for his father at his father's service station.
*215 When Mrs. Durand visited the defendant in the parish jail the week after the shootings, he was very upset, crying about what had happened. He has cried about the shootings each time she has visited him since then. Mrs. Durand testified she visits the defendant as often as she can. She stated she loved her son and would not forget him while he was in prison. The defendant did not testify.
After hearing the above evidence, the jury unanimously recommended the death penalty, finding two statutory aggravating circumstances: (1) that the murder of Charlotte Perry was committed during the perpetration or attempted perpetration of an attempted aggravated kidnapping, and (2) that the offender knowingly created the risk of death or great bodily harm to more than one person.

PRETRIAL ISSUES
Assignments of Error Nos. 1, 2, 3
Recusal issues
By these assignments, the defendant asserts the trial court erred in denying his motions to recuse the district attorney or his assistants from prosecuting the case. The defendant also claims as error the denial of his motion to have Assistant District Attorney (ADA) Phil Haney, sequestered as a defense witness.
The record shows three motions to recuse were filed. The first motion sought to recuse ADA Haney based on his involvement in the investigation of the case and based on the defense's intention to call him as a witness.[4] The second motion asserted the district attorney's office could not be fair and impartial because Tom Lovas, an investigator for the district attorney's office, was the brother-in-law of one of the victims, Theresa Stoute (and hence, the uncle of Charlotte Perry). The motion also stated the defendant was the stepson of the Chief Deputy of the St. Martin Parish Sheriff's Office. The third motion reurged the reasons set forth in the previous motions and asserted the district attorney withheld impeachment evidence on one of the state's witnesses, failed to comply with discovery rules, and failed to comply with the Rules of Professional Conduct.
La.C.Cr.P. art. 680 mandates recusal of the district attorney when he:
(1) Has a personal interest in the cause or grand jury proceeding which is in conflict with fair and impartial administration of justice;
(2) Is related to the party accused or to the party injured, or to the spouse of the accused or party injured, or to a party who is a focus of a grand jury investigation, to such an extent that it may appreciably influence him in the performance of the duties of his office; or
(3) Has been employed or consulted in the case as attorney for the defendant before his election or appointment as district attorney.
Separate hearings were held for each motion filed. See La.C.Cr.P. art. 681. The first motion was heard January 4, 1991. Haney testified he accompanied Detective Eddie Romero to Jefferson Parish on April 16, 1990 to help pick up the defendant and transport him back to St. Martin Parish. The St. Martin Parish Sheriff's office regularly called an assistant district attorney for assistance whenever a person was charged with first or second degree murder to ensure correct legal procedures were observed. In keeping with this practice, Haney checked the search warrant for the defendant's car to make sure it was valid, made some legal suggestions, and accompanied the Jefferson Parish officer to the district judge to have the warrant signed. While Haney and Romero had arrived in Jefferson Parish between 3:30 a.m. and 5 a.m., Haney did not see the defendant until sometime after lunch.
Prior to the drive back to St. Martin Parish, Romero read the defendant his *216 rights and instructed him not to talk about the case. Romero and the defendant sat in the front seat of the unmarked police vehicle while Haney sat in back. Although Haney could see the defendant in the front seat, he could not observe the defendant's characteristics and mannerisms. At some point, the defendant indicated he wanted to speak to his stepfather, Chief Deputy Durand. Haney did not discuss anything about the case with the defendant.
Romero confirmed Haney's testimony in all important respects. He testified Haney did not participate in the investigation, did not gather evidence, and did not instruct Romero in any way. According to Romero, Haney was there in a legal advisory capacity only. Romero added only that on the trip to St. Martin Parish, the defendant talked of weather, traffic, family, and made a brief comment about "messing up real bad." According to the officer, Haney made no conversation whatsoever.
After hearing this testimony, the trial judge found that the fact Haney may have been in the defendant's presence for the trip back to St. Martin Parish did not make him a necessary witness, especially considering nothing of significance occurred during the trip. So finding, the trial judge refused to recuse Haney from prosecuting this case. Defense counsel objected. This court denied a writ on the issue on January 24, 1991. See, 573 So.2d 1125 (La.1991).
The second motion was heard February 18, 1991. The defense introduced the file and argued the district attorney's office could not be fair and impartial based on the familial relationships between the district attorney's office and the victims, and the familial relationship between the defendant and the St. Martin Parish Sheriff's office. The trial judge held the familial relationship between the victims and the district attorney's investigator would not impair the duty of the prosecutor to prosecute and denied the motion. The trial judge questioned how the relationship between the defendant and the Chief Deputy Sheriff was a ground for recusal of the district attorney's office. The defense objected to the denial of the motion. This court denied writs on the issue on March 14, 1991, with the notation: "Denied on the showing made at this time." See 576 So.2d 56 (La.1991).
The third motion was heard March 14, 1991. In the motion, the defense reurged the information alleged in the two previous motions and alleged the state withheld impeachment evidence regarding Detective Romero, a state witness, despite a discovery motion to disclose this information. At the hearing, Romero admitted he had been convicted for violating the civil rights of a murder suspect in 1986 by striking the suspect with a baseball bat. The defense showed this information was not disclosed in answer to its discovery motion. The first court-appointed attorney to represent the defendant, Kim Kidd, who filed the motion, was a former ADA who had knowledge of Romero's conviction.
In response, the state elicited testimony Romero did not threaten or coerce the defendant in this investigation. Romero stated the district attorney's office did not advise him to withhold information regarding his conviction. Attorney Kidd testified he knew of Romero's conviction at the time he filed the discovery motion. He claimed he was not working for the district attorney's office at the time he filed the discovery motion and the district attorney's office did not ask him to conceal the information.
The trial court denied the third motion to recuse. The defense objected. In a writ filed to this court, the focus of the defense's argument shifted to his prior claim that Haney would be called as a defense witness because Haney had relevant knowledge concerning the defendant's defense of intoxication or intoxication as a mitigating circumstance. Writ application, No. 91-KD-0672, p. 2. The defense claimed Haney's testimony was vital. Id., p. 3. This court denied a writ on March 22, 1991. See 577 So.2d 4 (91-KD-0672) (La.1991).
ADA Haney
On appeal, Bourque contends the trial court erred in failing to recuse Haney or to order his sequestration. In a motion to recuse the district attorney, "the defendant bears the burden of showing by a *217 preponderance of the evidence that the district attorney has a personal interest in conflict with the fair and impartial administration of justice." State v. Edwards, 420 So.2d 663, 673 (La.1982). While this standard of proof is applicable for the disqualification of an assistant district attorney, the grounds for disqualification are not necessarily restricted to the statutory grounds to recuse a district attorney as set forth in La.C.Cr.P. art. 680. See State v. Allen, 539 So.2d 1232, 1234 (La.1989).
The record is clear the actions taken by Haney did not amount to participating in the investigation of this case. Haney undertook actions only within his role as assistant district attorney. Compare State v. Whitmore, 353 So.2d 1286, 1290-91 (La. 1977) (motion to recuse properly denied and district attorney's actions described as "routine" where district attorney took stand at suppression hearing to refute allegations of promises of leniency and took stand at trial to lay foundation for admission of confession); State v. Sheppard, 350 So.2d 615, 633 (La.1977) (motion to recuse district attorney properly denied and actions described as "consistent with his function as the prosecutorial force" where district attorney interviewed defendant immediately after arrest and held a press conference regarding the arrest); State v. Bennett, 341 So.2d 847, 858 (La.1976) (same as above). Thus, the trial court properly denied the defendant's motion to recuse the assistant district attorney.
Further, there was no error in the trial court's refusal to order Haney sequestered. See State v. Fallon, 290 So.2d 273, 279 (La.1974) ("because defense counsel desires to interrogate as his witness an assistant district attorney actively engaged in the trial does not mean that the defense may compel his sequestration and disrupt the trial"); La.Code Evid. art. 615.
There was nothing preventing the defendant from calling Haney to the witness stand. The general rule acknowledges the right of a criminal defendant to call relevant witnesses to present a defense but maintains the broad discretion of a trial court, while determining the competency and relevancy of witnesses, to prevent the calling of a prosecutor as a defense witness unless the prosecutor possesses unique information relevant and material to the theory of the defense. State v. Tuesno, 408 So.2d 1269, 1272-73 (La.1982). The record shows the trial court did not prevent the defendant from calling Haney to testify.
Defense counsel did not call Haney to the stand, citing the trial court's refusal to sequester Haney as precluding the defense from calling Haney as a witness. The defense feared Haney's position as prosecutor would influence the jury to give more credence to his testimony. The trial court noted Haney was to have been called as a witness for two specific purposes. The first purpose was to testify as to Bourque's condition at the time Haney traveled with the defendant from Jefferson Parish to St. Martin Parish. The trial court noted Haney's participation in the case had neither lessened nor increased his knowledge about that particular instance. The second purpose was to testify as to preliminaries regarding the voluntariness of certain statements which may have been made by the defendant during the trip. The trial court noted these statements were not introduced in evidence, so there was no need to call Haney for the second purpose. While not disagreeing with the court's analysis, defense counsel reiterated its reasoning. When invited to proffer the evidence, defense counsel declined.
The record supports the trial court's finding Haney was not a necessary witness for the defense. Although the defense claimed Haney was necessary to its defense of intoxication, the testimony adduced at trial shows this is not so. Charlotte Perry was killed about 11 p.m. on April 15, 1990. The first person to whom defendant spoke after the shooting was Ian Robinson in Metairie sometime after midnight. Robinson did not think Bourque was intoxicated. Thereafter, Bourque drank vodka at the apartment and at least one beer at the Metairie bar. Jefferson Parish officials were the next persons to be in contact with the defendant. Some of them testified the defendant did not appear intoxicated. Considering *218 Haney did not come in contact with Bourque until the afternoon of the next day, the importance and relevance of his testimony with regard to the defense's claim of intoxication is unsubstantiated. More likely witnesses for the intoxication defense would have been those persons who saw the defendant either immediately before or after the shooting of Charlotte Perry. See Tuesno, 408 So.2d at 1273.
District Attorney's office
The defense moved to recuse the district attorney's entire office in its second and third motions based on the family relationship existing between the district attorney's investigator and the victims and the defendant's relationship with the Chief Deputy Sheriff of St. Martin Parish. In brief to this court, Bourque also contends the district attorney should have been recused because the first defense counsel appointed to represent the defendant, Kim Kidd, was a former assistant district attorney. Bourque argues there was a conflict of interest not remedied by Kidd's dismissal as lead defense counsel because Kidd served as a consultant during jury selection.
The district attorney's investigator, Tom Lovas, is Mrs. Stoute's brother-in-law and was Charlotte Perry's uncle. Although admitting in an earlier writ application to this court that Lovas was not involved in the investigation of this case,[5] the defendant claims this relationship would cause Lovas to influence the actions of the district attorney's office to such an extent the entire office's prosecutorial function would be tainted.
We disagree. The defendant did not present any evidence tending to show a personal interest on behalf of the entire district attorney's office which would threaten the fair and impartial administration of justice. "The mere presence of a victim's relative in the district attorney's office does not support a finding of recusal." State v. West, 561 So.2d 808, 811 (La.App. 2 Cir.), writ denied, 566 So.2d 983 (La.1990) (where victim of robbery was father of assistant district attorney not assigned to case).
The defendant is the stepson of Alan Durand, Chief Deputy of St. Martin Parish. Upon his return to St. Martin Parish, Bourque requested he be allowed to talk to his stepfather. He now claims this meeting violated his rights to an attorney and to remain silent and gives rise to an appearance of impropriety. The defendant concedes, however, he can point to no prejudice which resulted from this interview. No statements made at this time were introduced in evidence. We agree with the trial court; defendant has not carried his burden of showing how the district attorney's office could be influenced to the extent it could not operate in a fair and impartial manner by the defendant's family relationship with a sheriff's deputy.
Although conceding the prior employment relationship between the district attorney's office and Kim Kidd is not enough to warrant recusal, the defendant asserts Kidd learned of evidence favorable to the defense while an assistant district attorney. At the hearing on the third motion to recuse, Kidd acknowledged he knew Romero had been convicted of a civil rights violation when Kidd represented the defendant. Romero admitted the conviction and provided some details. When the defense sought to question Romero regarding any civil consequences of the action, the trial court sustained the state's objection on the grounds of relevancy. The defendant now argues he could have shown a conflict of interest between the district attorney's office and Kidd had he been allowed to continue with this line of questioning.
The record shows the correctness of the trial court's holding. Romero was thoroughly questioned as to the prior conviction and any relevance it would have on the investigation of this matter. Both Romero and Kidd denied any instructions from the district attorney's office to conceal Romero's conviction. Under La.Code Evid. art. 609.1(C), the trial court properly allowed into evidence only the fact of conviction, *219 the name of the offense, the date of the offense, and the sentence imposed.
Early in the case and directly after he had been appointed to represent the defendant, Kidd filed a motion to withdraw as lead defense counsel based on his close relationship with Tom Lovas and Alan Durand. The trial court granted the motion and new counsel was appointed.
New defense counsel subsequently and specifically requested Kidd's assistance in selecting the jury due to Kidd's greater familiarity with the jury pool in St. Martin Parish. The state vehemently objected, arguing the defendant would raise the issue on appeal, as has occurred. Only after much reluctance, and the forceful argument of defense counsel, did the trial court permit Kidd to participate in this limited capacity. Considering the defense's forceful argument to retain Kidd in the extremely limited capacity he filled, and defense counsel's assurances no prejudice would result to the defendant, we find no error in the trial court's ruling.
Assignment of Error No. 4
Indictment issue
The defendant argues the trial court erred in denying his motion to quash the indictment. Bourque contends the indictment was defective because it did not contain the aggravating circumstances the state would rely on to prove first degree murder. Although he acknowledges the defect complained of may be remedied by advance notice prior to trial, he claims he did not receive such information.
The indictment in this case states, in pertinent part, "that one SCOTT JUDE BOURQUE... with force and arms, on or about the 15th day of April [1990] [d]id commit first degree murder of Charlotte Louise Perry, in violation of La.R.S. 14:30FIRST DEGREE MURDER."
Under La. Const. art. I, § 13, an accused shall be informed of the nature and cause of the accusation against him. That requirement is implemented by La. C.Cr.P. art. 464 which sets forth the requirements of an indictment. La.C.Cr.P. art. 465 authorizes the use of specific short form indictments in charging certain offenses, including first degree murder. The indictment at issue follows the short form authorized in Art. 465. The use of short form indictments is constitutionally valid. State v. Baylis, 388 So.2d 713, 719 (La. 1980); State v. Liner, 373 So.2d 121, 122 (La.1979). The indictment at issue was not defective.
Contrary to the defendant's assertion, the record shows he received notice well in advance of trial of the aggravating circumstances the state relied on to prove first degree murder in the state's answer filed October 19, 1990. In fact, the defendant's motion to quash, filed January 25, 1991, argued the evidence was insufficient to support a finding of first degree murder under R.S. 14:30(A)(1), and that R.S. 14:30(A)(3) was unconstitutionally vague and overbroad.
The defendant's other arguments regarding the sufficiency of the evidence will be discussed in other sections of this opinion.
Assignments of Error Nos. 5, 6, 7
Jefferson Parish issues
By these assignments, the defendant contends the trial court committed reversible error in failing to suppress evidence seized from his car pursuant to a warrant, evidence seized from his person incident to his arrest, and inculpatory oral statements he gave while in Jefferson Parish and on the ride back to St. Martin Parish.
evidence seized from car
As to the evidence seized from his car, the defendant asserts the search warrant was not based on probable cause as it was not based on the personal knowledge of the police officer who prepared the warrant. Most of the information was provided by Ian Robinson. The defendant complains there was nothing to indicate Robinson's credibility and points out Robinson failed to provide a written statement or testify before the signing judge.
In order to be valid, "a search warrant may issue only upon probable cause established to the satisfaction of the judge, by *220 the affidavit of a credible person, reciting facts establishing the cause for issuance of the warrant." La.C.Cr.P. art. 162; La. Const. art. I, § 5. This court has held probable cause exists "when the facts and circumstances within the affiant's knowledge and of which he has reasonably trustworthy information, are sufficient to support a reasonable belief that an offense has been committed and that evidence or contraband may be found at the place to be searched." State v. Byrd, 568 So.2d 554, 559 (La.1990) (citation omitted).
A judicial officer "must make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit, there is a `fair probability' that evidence of a crime will be found in a particular place." Byrd, 568 So.2d at 559. On appeal, this court must find only that the issuing judicial officer had a "substantial basis" for finding the existence of probable cause. Id.; See Illinois v. Gates, 462 U.S. 213, 239-41, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).
The application for the complained-of search warrant states the affiant, JPSO Sergeant Schultz, was informed by Detective Romero of the St. Martin Parish Sheriff's office about a white male murdered in Vermillion Parish on April 15, 1990 with a 9 MM semiautomatic handgun. A witness had positively identified Scott Bourque as the person who committed the murder. Sgt. Schultz was also informed that, about one hour later, Scott Bourque was identified as having been involved in another shooting in St. Martin Parish. At that location, one person was shot and killed with a 9 MM handgun and a second victim was shot with a shotgun and seriously injured.
From Ian Robinson, Sgt. Schultz learned the defendant had arrived at the apartment of his friend in Metairie, La., where Robinson was staying, at approximately 2 a.m. The defendant asked to stay and told Robinson he had killed three people. Robinson saw Bourque use the telephone and confirm that the defendant thought the people he had shot had been killed. Robinson observed the defendant in possession of a chrome plated 9 MM semi-automatic pistol. Robinson saw a 12-gauge shotgun in the white Chevrolet Corsica driven by Bourque and placed this weapon on the back seat under some clothes. Robinson told Sgt. Schultz that Robinson had known police officers frequented the lounge and he took the defendant there to obtain help. While at the bar, Robinson alerted the bartender of the defendant's earlier inculpatory statement. The bartender relayed the information to an off-duty police officer, who in turn requested an off-duty fireman to contact police.
Sgt. Schultz was notified and came to the location after other Jefferson Parish officers had arrived and detained the defendant. Sgt. Schultz contacted his superior, who in turn contacted the St. Martin Parish Sheriff's office to verify the defendant was wanted for murder. After receiving confirmation from St. Martin Parish, Bourque was arrested. In the affidavit, Sgt. Schultz stated he personally observed a 9 MM semi-automatic, chrome-plated pistol on the floor of the driver's seat and a bank bag through the window of the vehicle.
A review of the affidavit supporting the application for the search warrant of the defendant's car shows there was a substantial basis for finding probable cause. Thus, there was no error in the trial court's denial of Bourque's motion to suppress the evidence seized from the defendant's vehicle.
The fact that the information contained in the affidavit supporting the application for the search warrant was not completely based on the personal knowledge of the attesting officer but on what he had been told by others is no bar to finding the warrant valid. This court has repeatedly held the facts necessary to show probable cause may be established by hearsay evidence. State v. Duncan, 420 So.2d 1105, 1109 (La.1982); State v. Jeffcoat, 403 So.2d 1227, 1229 (La.1981). As to the reliability of Robinson's information, there is a presumption of inherent credibility attaching to citizen informants. State v. Kyles, 513 So.2d 265, 271 (La.1987), cert. denied, 486 *221 U.S. 1027, 108 S.Ct. 2005, 100 L.Ed.2d 236 (1988); State v. Morris, 444 So.2d 1200, 1203 (La.1984). The defendant has shown no evidence to rebut this presumption.
evidence seized from the defendant
As to the evidence seized from the defendant's person in Jefferson Parish, Bourque contends no search warrant authorized the seizure. He claims discrepancies in the testimony of JPSO officers regarding the number of shells the defendant had on his person are significant because the booking sheets are inconsistent with the testimony of these officers. Bourque also argues no foundation was laid for the introduction and use of these booking sheets at the suppression hearing and therefore, they should not have been used as competent evidence.
Officers may conduct a limited search for weapons during a lawful investigatory stop, State v. Ruffin, 448 So.2d 1274, 1279 (La.1984); Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), especially where such a search is necessary to neutralize the threat of physical harm. State v. Cobb, 419 So.2d 1237, 1242 (La. 1982). The state bears the burden of proving the validity of a warrantless search. Ruffin, 448 So.2d at 1279; Cobb, 419 So.2d at 1242.
At the suppression hearing, Officer Reggio of the Jefferson Parish Sheriff's Office testified he and other JPSO officers entered Lefty's Lounge and asked the defendant to accompany them outside because there was a question concerning the automobile he was driving. Once outside, the officers patted down the defendant to search for weapons.
Prior to this, Officer Reggio had been informed by Robinson the defendant might have been involved in a homicide. In addition, Officer Reggio had personally observed a handgun on the driver's seat floorboard of the defendant's vehicle.
Officer Reggio recovered two shotgun shells and a large roll of money from the defendant. Deciding the shotgun shells were not a threat, Officer Reggio returned both the shells and the money to the defendant. No items were removed from the defendant until after he was arrested and taken to lock up.
Sgt. Schultz testified three shotgun shells were taken from the defendant at booking. Sgt. Schultz also referred to the booking sheet used to record all of the defendant's property taken from him at lock up. The defense objected on the basis no proper foundation was laid for introduction of the booking sheet. The state responded by withdrawing the booking sheet from evidence. The trial court denied the defendant's motion to suppress the items seized from his person in Jefferson Parish.
The suppression hearing record shows the JPSO officers carried their burden of showing a lawful investigatory stop. Considering the officers saw a weapon in plain view in the defendant's vehicle, and had information the defendant may have been involved in a homicide earlier in the evening, a limited pat down search for weapons on the defendant's person was warranted. The discrepancy between the number of shells observed by Sgt. Schultz and Officer Reggio would go toward the weight to be afforded the evidence, not its admissibility. The defendant's argument regarding the booking sheet is moot, since the state withdrew it from evidence at the suppression hearing and did not attempt to introduce it at trial.
oral inculpatory statements made by the defendant
The defendant claims the trial court erred in failing to suppress certain inculpatory oral statements which he made while detained in Jefferson Parish and after he invoked his right to confer with an attorney.
To protect the privilege against self-incrimination guaranteed by the Fifth Amendment, the police must terminate interrogation of an accused in custody if the accused requests the assistance of counsel. Miranda v. Arizona, 384 U.S. 436, 474, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966). "[W]hen counsel is requested, interrogation must cease, and officials may not reinitiate *222 interrogation without counsel present, whether or not the accused has consulted with his attorney." Minnick v. Mississippi, 498 U.S. 146, 153, 111 S.Ct. 486, 491, 112 L.Ed.2d 489 (1990); State v. Abadie, 612 So.2d 1, 4-5 (La.1993), petition for cert. filed. Once an accused has expressed his desire to deal with law enforcement officials only through counsel, he "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Edwards v. Arizona, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 1884-85, 68 L.Ed.2d 378 (1981).
The state bears the burden of proving, beyond a reasonable doubt, that a statement given by the defendant was voluntary, and not influenced by fear, duress, intimidation, menaces, threats, inducements, or promises. State v. Brooks, 541 So.2d 801, 814 (La.1989); State v. Narcisse, 426 So.2d 118, 125 (La.1983), cert. denied 464 U.S. 865, 104 S.Ct. 202, 78 L.Ed.2d 176 (1983); La.C.Cr.P. art. 703(D); LSA-R.S. 15:451. Whether a statement is voluntary is a fact question; thus, the trial judge's ruling, based on conclusions of credibility and weight of the testimony, is entitled to great deference and will not be disturbed on appeal unless there is no evidence to support the ruling. Brooks, 541 So.2d at 814.
In making its determination, the trial judge must consider any physical condition of the defendant which might be relevant to the voluntariness inquiry, including intoxication. "Intoxication can render a statement involuntary if the intoxication is of such a degree that it negates defendant's comprehension and renders him `unconscious of the consequences of what he is saying.'" Narcisse, 426 So.2d at 125-26 (citations omitted); State v. Simmons, 443 So.2d 512, 515 (La.1983).
At the suppression hearing, Officer Reggio testified he advised the defendant of his rights in the parking lot of Lefty's Lounge by reading from a Miranda card. Once Bourque requested a lawyer, Officer Reggio stopped any and all questioning of the defendant. Later, the officer assisted in placing the defendant in a police unit when Bourque "just turned around, right out of the blue, and he said, oh, by the way, I killed three people tonight."[6] Immediately thereafter, another officer asked defendant where these people were and whether law enforcement officers could help them in any way.
Reggio stated the officers had been at the scene between an hour and an hour and a half. The statement given by the defendant was not made in response to interrogation, threats, force, or coercion.
Officer Reggio stated the defendant did not have any trouble walking or talking. The defendant appeared to understand his rights and gave appropriate answers to questions asked of him. When asked if he had provided the defendant with the means of contacting an attorney, the officer stated the defendant was entitled to a phone call after he arrived at the lock up.
Bourque contends his statement was not spontaneous, considering the length of time it took from the time he was detained until his arrest. Citing La.C.Cr.P. art. 230[7], he claims the police should have given him access to an attorney immediately, either by taking him to the station sooner or permitting him to make a telephone call at the scene. He disputes that the statement was voluntary, considering the time he was kept waiting, the late hour, and his alleged intoxicated state.
The trial court agreed a person arrested has a right to an attorney from the moment of arrest under La.C.Cr.P. art. 230. However, in effecting that right, and under the circumstances present here, and further *223 considering this was a parking lot of a bar in the early morning hours, the trial court found it would be difficult to afford an arrested person that right immediately and on the scene. Under the circumstances, the fact the officers immediately ceased questioning coupled with the fact the defendant would be afforded an opportunity to call an attorney within minutes of his arrest, the trial court found the officers sufficiently complied with protecting the defendant's statutory and constitutional rights. The trial court denied the motion to suppress the oral statement.
The facts adduced at the suppression hearing clearly support the trial court's ruling. The defendant was advised of his constitutional right to remain silent and his right to an attorney. The statement made after those warnings were given was spontaneous and not in response to police interrogation. State v. Castillo, 389 So.2d 1307, 1310 (La.1980), cert. denied, 453 U.S. 922, 101 S.Ct. 3159, 69 L.Ed.2d 1004 (1981) ("Spontaneous and voluntary statements, not given as a result of police interrogation or compelling influence, are admissible in evidence without Miranda warnings even where a defendant is in custody.").
Bourque complains about two other inculpatory statements. On the ride from Jefferson Parish to St. Martin Parish with Detective Romero and ADA Haney, the defendant stated he had "messed up real bad." In addition, the defendant apparently gave a taped statement to authorities at the St. Martin Parish Jail shortly after his arrival there after he spoke to his stepfather but before he spoke to an attorney. Although the statement made in the car and statements allegedly made at the St. Martin Parish Jail were not entered as evidence, Bourque contends they showed the denial of his right to counsel. As discussed supra, the defendant was not denied his right to counsel. Since these statements were not entered in evidence, the defendant was not prejudiced thereby.
Assignment of Error No. 8
Pre-trial issues
The defendant asserts the trial court erred in denying defense counsel's motion for continuance at a pretrial motion hearing. He claims the motion hearing was of critical importance to the defense since it was seeking the recusal of the assistant district attorney prosecuting the case.
The record shows several motions were scheduled for a January 4, 1991 hearing after a defense continuance from an earlier date. Gary LeGros entered an appearance as counsel for the defendant and stated he was to be brought in as co-counsel in the matter. Lead defense counsel, Don Hernandez, was not present due to a death in the family. Since LeGros had been brought in as co-counsel the afternoon before the hearing, the scheduled motions would have to be continued again. The state objected, since several out-of-town witnesses had been inconvenienced. The trial court overruled the state's objection.
LeGros then filed the first motion to recuse ADA Haney. LeGros stated he had no evidence to present, but was prepared to argue the motion and the attached memorandum. The state objected and asked this motion also be continued because the state had not had a chance to review the motion. The defense agreed. The state then decided it could proceed with the recusal motion. Contradictorily, the defense then moved for a continuance at a bench conference. The state complained of the delays caused by the defense's tactics. The trial court denied the motion for continuance, holding:
it is the feeling of the Court that this involves an isolated particularized sort of an issue that can well be determined and can well be handled by you at this time.
Vol. 3, pp. 718-19.
Defense counsel objected to the ruling. Haney and Detective Romero were then called to the stand and questioned. As previously discussed, this first motion to recuse was denied by the trial court.[8]
*224 "The granting or refusal of a motion for a continuance rests within the sound discretion of the trial judge." State v. Simpson, 403 So.2d 1214, 1216 (La.1981). This ruling will not be disturbed absent a clear abuse of discretion. State v. Washington, 407 So.2d 1138, 1148 (La.1981); Simpson, 403 So.2d at 1216. Whether a refusal is justified depends on the circumstances of the case. In general, this court has declined to reverse a conviction based on the denial of a motion for continuance absent a showing of specific prejudice. Id.
The record supports the trial court's conclusion that LeGros's performance was more than adequate. In addition, the defense urged the recusal issue in two other motions, both of which were denied after hearings. Thus, the defense had two more opportunities to put on evidence to support its motions to recuse the district attorney or his assistants. There was no abuse of the trial court's discretion in denying the motion for continuance. The defendant can show no prejudice from the ruling.
Assignment of Error No. 9
The defendant asserts the trial court erred in refusing to allow further questioning of Detective Romero at the hearing on the third motion to recuse. Bourque contends the specifics of Romero's 1986 battering of a potential murder suspect was important in two respects. First, the information would have been important impeachment evidence as to Romero's credibility. Second, since Romero was not prosecuted locally for the offense, but by federal authorities, and since Haney and Kim Kidd (the first appointed counsel for the defendant), were assistant district attorneys at the time, the information gave rise to the inference of a substantial friendship between Romero, Haney, and Kidd.
As discussed supra,[9] Romero admitted the conviction at the hearing. Under La. Code Evid. art. 609.1, "only the fact of a conviction, the name of the offense, the date thereof, and the sentence imposed is admissible." None of the circumstances requiring further disclosure is applicable here. Further, Romero did not testify at trial. Any impeachment value of the information was thus mooted. Even assuming a friendship existed between Romero, Haney, and Kidd, the defendant cannot show any possible prejudice to his defense.

VOIR DIRE
Assignments of Error Nos. 10, 11, 12
Sequestration issues
Bourque argues the trial court erred in failing to order individual sequestered voir dire. He claims there was substantial pretrial publicity of both the Perry shooting and the shooting in Vermilion Parish which contaminated the potential jurors. The defendant also claims that increasing the number of jurors questioned from panels of three to six was without justification.
There is no provision in our law which prohibits or requires the sequestration of prospective jurors for individual voir dire. State v. Copeland, 530 So.2d 526, 535 (La.1988), cert. denied, 489 U.S. 1091, 109 S.Ct. 1558, 103 L.Ed.2d 860 (1989); State v. Comeaux, 514 So.2d 84, 88 (La. 1987); State v. David, 425 So.2d 1241, 1247 (La.1983). The manner in which voir dire is conducted, such as whether the jurors should be called singly or in groups of a certain number, is left to the trial court's discretion. La.C.Cr.P. art. 784, Comment c; Copeland, 530 So.2d at 535. The burden is on the defendant to show that the trial court abused its discretion in refusing to sequester the venire at voir dire. Comeaux, 514 So.2d at 88. The trial court does not err in refusing requests for individual voir dire without a showing of special circumstances. Copeland, 530 So.2d at 535; Comeaux, 514 So.2d at 88. The defendant must show there will be a significant possibility that individual jurors will be ineligible to serve because of exposure to potentially prejudicial material. David, 425 So.2d at 1247. The fact that a case is a capital case does not alone establish the existence of special circumstances. Copeland, 530 So.2d at 535; Comeaux, 514 *225 So.2d at 88; State v. Wingo, 457 So.2d 1159, 1165 (La.1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2049, 85 L.Ed.2d 322 (1985).
Bourque claims this case presented special circumstances requiring individual voir dire and points to the sensational nature of the mother/daughter shooting and the fact of the Vermilion Parish shooting. Prior to trial, the defendant filed a Motion for Individual, Sequestered Voir Dire Examination based on pretrial publicity. In the motion and at the hearing on the motion, defendant reserved his right to move for a change of venue after voir dire had commenced if it appeared impossible to obtain a fair and impartial trial in St. Martin Parish. No such motion was ever filed.
The record shows the trial judge initially ordered panels of three prospective jurors to be examined outside the presence of the jury venire. Each panel was asked whether they had heard anything about the case, whether through television, newspaper, radio, or word of mouth. If a prospective juror indicated he or she had any knowledge whatsoever, the other members of the panel were removed and the juror was examined more particularly as to his or her knowledge. Any juror who had knowledge of the Vermilion Parish shooting was promptly excused either by the court or on joint motion of the state and defense counsel. Any juror who stated he or she could not put aside any knowledge they possessed about the case in the face of the evidence that was to be presented from the witness stand was similarly excused. The record does not support the defendant's claim that the jurors empanelled had any knowledge of the Vermilion Parish shooting or prejudicial knowledge of the shooting of Charlotte Perry and Theresa Stoute.
In addition, the record shows there was no error in the trial court's enlargement of the panels from three to six prospective jurors. After three days of voir dire examination taking the prospective jurors in panels of three, no juror had yet been empanelled. On the fourth day of voir dire examination, the trial judge announced he would enlarge the panels of prospective jurors to six. As before, the trial court allowed separate examination of any prospective juror who indicated he or she had knowledge of the case.
The record reveals no abuse of discretion by the trial judge in enlarging the panels to six persons. The "special circumstances" alleged by Bourque were provided for in the manner in which the voir dire examination was accomplished.
Assignments of Error Nos. 13, 14, 15, 16, 17, 18
Individual Juror Objections
By these assignments, Bourque contends the trial court erred in refusing to excuse several jurors based on his challenges for cause. This required him to exercise peremptory challenges for all but one of these jurors. He claims as error the court's failure to grant him additional peremptory challenges.
"[A]n erroneous ruling of a trial judge which deprives a defendant of one of his peremptory challenges constitutes a substantial violation of a constitutional or statutory right requiring reversal of his conviction and sentence." State v. McIntyre, 365 So.2d 1348, 1351 (La.1978). In order to prevail on this claim where the defendant has used a peremptory challenge after his challenge for cause has been denied, the defendant must show "(1) that a challenge for cause by the defendant was erroneously denied by the trial judge; and (2) that all of the defendant's peremptory challenges had been exhausted." State v. Lee, 559 So.2d 1310, 1316 (La.1990), cert. denied, ___ U.S. ___, 111 S.Ct. 1431, 113 L.Ed.2d 482 (1991). In the instant case, Bourque's peremptory challenges were exhausted before completion of the panel; therefore, his objection to the rulings refusing to sustain his challenges for cause are properly before this court.
La.C.Cr.P. art. 797 provides the state or the defendant may challenge a juror for cause on the following grounds:
(1) The juror lacks a qualification required by law;
(2) The juror is not impartial, whatever the cause of his partiality. An opinion or *226 impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence.
(3) The relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and the defendant, the person injured by the offense, the district attorney, or defense counsel, is such that it is reasonable to conclude that it would influence the juror in arriving at a verdict;
(4) The juror will not accept the law as given to him by the court; or
(5) The juror served on the grand jury that found the indictment, or on a petit jury that once tried the defendant for the same or any other offense.
"[A] challenge for cause should be granted, even when a prospective juror declares his ability to remain impartial, if the juror's responses as a whole reveal facts from which bias, prejudice or inability to render judgment according to law may be reasonably implied." State v. Hallal, 557 So.2d 1388, 1389-90 (La.1990); State v. Jones, 474 So.2d 919, 926 (La.1985), cert. denied, 476 U.S. 1178, 106 S.Ct. 2906, 90 L.Ed.2d 992 (1986). A trial judge is afforded great discretion in determining whether cause has been shown to reject a prospective juror. Such determinations will not be disturbed on review unless a review of the voir dire as a whole indicates an abuse of discretion. Jones, 474 So.2d at 926.

GARY THERIOT
The defendant contends the trial court erred in refusing his challenge for cause on the grounds that Gary Theriot was reluctant to accept intoxication either as a defense to specific intent in the guilt phase or as a mitigating circumstance in the penalty phase.
When asked his opinion of the death penalty, Mr. Theriot responded: "If a person is going to kill someone, and if it's in his state of mind, I believe he should get the same punishment. There's no reason why two people should kill each other." Further questioning by defense counsel elicited responses which indicated Mr. Theriot would be unable to consider mitigating circumstances. The state was later able to rehabilitate Mr. Theriot by explaining the differences between the two phases of trial and what was expected of Mr. Theriot in each phase. At that point, Mr. Theriot responded he would be willing to consider mitigating evidence before deciding whether to impose a sentence of death. He indicated he could vote for either life imprisonment or the death penalty at the penalty phase of the trial, depending on the evidence presented.
Defense counsel re-examined Mr. Theriot at length. In this exchange, Mr. Theriot reiterated he would consider all the evidence before making a determination of guilt or innocence and in determining the appropriate penalty. Mr. Theriot also stated defense counsel had misled him in their earlier exchange. After discussing intoxication as a defense to specific intent in the guilt phase, the following exchange occurred:
MR. THERIOT: Yes, I would consider the fact of intoxication on making my decision. I would have to consider it, yes.
DEFENSE COUNSEL: But is your support for the death penalty so vigor [sic] that that would cloud the consideration of the mitigating factors?
MR. THERIOT: I'd probably say yes.
Vol. 8, p. 1773
The state again attempted to rehabilitate the juror and elicited the response that Mr. Theriot's philosophy regarding the death penalty was not so strong it would outweigh his ability to give consideration to mitigating factors.
The defense challenged Mr. Theriot for cause. The trial court decided to question Mr. Theriot to clear up any confusion. Prior to the court's questioning, counsel for the state and defense agreed that "prevent" was a synonym for "preclude."
COURT: If at the end of the trial, and after you have heard all of the evidence, *227 the lawyer's arguments to you and my instructions to you on the law, and at that time you become convinced that the defendant has proved to you that he was so intoxicated that it prevented him from having specific intent, would you give him the benefit of that, and either find him not guilty or guilty of some lesser charge which would not require specific intent, and I need a yes or a no from you on that, sir. Do you understand my question?
MR. THERIOT: Yes, sir.
COURT: Are there any words or any language that gives you trouble that I can maybe translate for you
MR. THERIOT: I understand what you're saying, it's just a hard question to answer.
COURT: Yes, sir. But I need an answer from you, either yes or no.
MR. THERIOT: I would say, yes.
COURT: Alright. Thank you, sir.
Vol. 8, pp. 1778-79
The trial court denied the defense's challenge for cause, finding Mr. Theriot "has stated point blank that he would give the benefit of intoxication." Defense counsel objected to the ruling and exercised a peremptory challenge against Mr. Theriot.
A challenge for cause should be granted when a prospective juror makes clear he or she expresses a predisposition as to the outcome of a trial. The challenge is properly denied, however, where subsequent questioning of a prospective juror indicates he or she is able to disregard previous views and make a decision based solely on the evidence presented at trial. Lee, 559 So.2d at 1318. "When assessing whether a challenge for cause should be granted, the trial judge must look at the juror's responses during [his or] her entire testimony, not just `correct', isolated answers; or, for that matter, `incorrect', isolated answers." Id., 559 So.2d at 1318 (citations omitted).
Although Mr. Theriot's initial answers to defense questioning indicated he would be unable to follow the law and consider the mitigating effects of the defense of intoxication in either the guilt or penalty phase of trial, a review of his entire testimony shows he would assess all of the evidence presented before making a decision. Part of the confusion of his examination stemmed from defense counsel's questions, as counsel acknowledged in the following exchange:
MR. THERIOT: I said I'm sorry if I confused so many people.
DEFENSE COUNSEL: No, I think I was the person who did the confusing.
Vol. 8, p. 1775
Mr. Theriot was successfully rehabilitated by the questioning of the trial court. The challenge for cause was properly denied.

THOMAS J. STEPHENS
At trial, the defendant challenged this potential juror based on Mr. Stephens' poor health, his relationship with the St. Martin Parish Sheriff, and his concerns about missing a pending election. Defense counsel objected to the trial court's denial of the challenge for cause and exercised a peremptory challenge against Mr. Stephens. The defendant now contends the trial court erred in denying his challenge for cause based on Mr. Stephens' stated concern for his aging father, the juror's own questionable health, and his concerns about voting in an upcoming election.
The record reveals no support for the defendant's claims. With regard to his own health, Mr. Stephens stated he had had heart surgery and had an upcoming appointment scheduled with a vascular surgeon for a test. He stated he became dizzy and nauseous when he worked under his car or under the sink to do plumbing while lying on his back with his arms extended. Mr. Stephens was not taking medication other than aspirin for his condition and was on a low-fat diet. He indicated that, as long as his appointment could be rescheduled and his doctor approved, he would have no trouble serving on the jury.
As to his concern for his father, Mr. Stephens explained he checked on his father *228 about twice a day, ran errands for him, and took him to weekly hospital or doctors' appointments. He admitted he "would feel a little disturbed" about missing the Easter holiday with his father.[10] Mr. Stephens informed the court, however, of a cousin whom his father would call on. He also stated he did not believe that his concern for his father would mean he would miss something of significance during the trial.
The record shows the extent of Mr. Stephens's political activity was also insufficient as a basis for a challenge for cause. When told he may not be able to vote in an upcoming election, Mr. Stephens indicated this would "disturb [him] to some extent" and he "would feel like I'm letting [his candidate] down." Earlier, however, he indicated if the court could not arrange some sort of absentee voting procedure, then "I just can't vote" and stated that "I understand."
With regard to his friendship with law enforcement personnel, Mr. Stephens stated he had friends who were police officers whom he saw when they rode by in their units. Mr. Stephens indicated he was friendly with the St. Martin Parish Sheriff and that he saw the sheriff on occasion, depending on the sheriff's activities. When defense counsel attempted to ask Mr. Stephens whether he would tend to believe the testimony of some of the sheriff's deputies over other witnesses, the state objected to the phrasing of the question. Although the trial court overruled the state's objection, defense counsel never returned to the issue.
The defendant failed to show that Mr. Stephens's friendship with law enforcement personnel destroyed an otherwise impartial attitude of the prospective juror. "Previous associations with either law enforcement agencies or personnel will not alone disqualify a prospective juror from service." Jones, 474 So.2d at 926. If Mr. Stephens' friendship was such as would disqualify him as a juror, it was for defense counsel to show such disqualification in the voir dire. State v. Chapman, 410 So.2d 689, 711 (La.1982).
Considering Mr. Stephens's responses to the voir dire examination as a whole, it cannot be said the trial judge abused his discretion in denying the defense's challenge for cause.

MARY ANN SYLVESTER
The defendant contends the trial court erred in refusing his challenge for cause for this prospective juror. Defense counsel objected to the ruling and exercised a peremptory challenge against Mrs. Sylvester. The defendant argues, that as the mother of seven children, Mrs. Sylvester would be worried about their welfare and the fact she would miss the Easter holiday with them to the point she could not be a qualified juror. Bourque also contends Mrs. Sylvester had a "deep-seated feeling" about murder which affected her qualifications.
The record shows these claims to be unfounded. Mrs. Sylvester indicated she had seven children, ages eleven through six months. Although her husband had some physical limitations due to a back problem, she stated her mother-in-law could help out and she would feel comfortable with that arrangement. Mrs. Sylvester stated it might affect her only "somewhat" if she had to miss the Easter holiday with her children and it might cause her to be less attentive. She later stated, however, there was nothing which would prevent her from sitting as a fair and impartial juror.
Mrs. Sylvester indicated she could vote for a life sentence although she did believe death was an appropriate penalty for some crimes. She stated she did not favor the death penalty as punishment every time a murder was committed.
When questioned by defense counsel, Mrs. Sylvester stated murder was the type of crime which particularly upset her and acknowledged her personal feelings might *229 flow over into the decision making process. She indicated she might have trouble following the judge's instructions not to allow this.
The state attempted to rehabilitate Mrs. Sylvester by asking her whether she was upset at the defendant or had any personal problem with him because he was charged with murder. Mrs. Sylvester responded negatively and further agreed her dislike of the crime of murder would not allow her to disregard the judge's instructions. She indicated she would be able to be a fair and impartial juror.
Once again defense counsel questioned Mrs. Sylvester. When questioned as to her conflicting responses, Mrs. Sylvester told defense counsel his earlier questions were unclear and that she had been confused. She indicated, however, her personal feelings were not going to enter into her deliberations. On further rehabilitation by the state, Mrs. Sylvester stated she would base her verdict on the evidence, would be fair and impartial to the defendant throughout the trial, and could follow the judge's instructions no matter what they were.
When considering Mrs. Sylvester's responses as a whole, the record supports the finding the trial court did not abuse its discretion in denying the defendant's challenge for cause. Lee, 559 So.2d at 1318.

TERRY A. BOREL
The defendant contends the trial court erred in denying his challenge for cause of this prospective juror. Bourque argues Mr. Borel had a conflict of interest in that he had been permitted to pay a fine in lieu of jail time for a petty theft and his appreciation to the district attorney rendered him unable to be a fair and impartial juror.
The record shows Mr. Borel was charged for taking gravel from the side of a road seven or eight years prior to his voir dire examination. Instead of going to court, Mr. Borel met with the district attorney, Danny Guidry, and paid a fine of $200. Mr. Borel agreed the district attorney had helped him and had done him a favor by handling the case in that manner so that Mr. Borel would not have to miss a whole day of work.
Mr. Borel later stated he did not feel he had been "let off" by the district attorney's office. He felt the judge in the case had set the fine and he just paid it at the district attorney's office rather than going to court. He repeatedly affirmed this experience would not affect his ability to be fair and impartial to the defendant.
The trial court denied Bourque's challenge for cause, finding the relationship between Mr. Borel and the district attorney's office "remote." Defense counsel objected to the ruling and exercised a peremptory challenge against Mr. Borel. The trial court did not abuse its discretion in denying the defendant's challenge for cause. The defendant has failed to show Mr. Borel's one-time involvement with the district attorney's office, and with a different district attorney, would prevent Mr. Borel from being a fair and impartial juror. See Lee, 559 So.2d at 1317 (where prospective juror had previously hired district attorney for unrelated legal matters, and who stated he might do so in the future, this court held insufficient to grant challenge for cause absent showing the relationship would have influenced the juror's decision); La.C.Cr.P. art. 797(3).

MASIL L. ROACH
The defendant contends the trial court erred in refusing to excuse this prospective juror for cause. He argues Mrs. Roach indicated she would be unable to consider the defense of intoxication as a mitigating factor in the penalty phase. Bourque asserts his argument against this prospective juror is different from the others whose challenges for cause were denied by the trial court. Instead of exercising a peremptory challenge against Mrs. Roach, defense counsel accepted her as a juror due to the fact the defense had only one peremptory challenge left at this time during jury selection.
Since Bourque accepted this juror after his challenge for cause was rejected without exercising his remaining peremptory *230 challenge, he has waived his right to assert this claim on appeal. See Fallon, 290 So.2d at 282.

RICKY G. MELANCON
The defendant contends the trial court erred in failing to excuse this prospective juror for cause based on his predisposition in favor of the death penalty and the fact that his sister, a physical therapist, had treated Theresa Stoute. The trial court rejected defense counsel's challenge for cause. Defense counsel objected to the ruling and exercised a peremptory challenge.
Reading the record of the voir dire examination of this potential juror as a whole, it is clear Mr. Melancon stated he could consider both a life sentence and the death penalty at the penalty phase of trial, depending on the circumstances of the crime and the evidence presented. Lee, 559 So.2d at 1318 (challenge for cause was not warranted for juror who stated initial reaction would have been to give defendant death penalty but further questioning showed she would assess all evidence before making a decision).
The record also shows the only information Mr. Melancon's sister related to him was the fact that she was treating a woman who had been injured by a gunshot wound. Mr. Melancon knew Theresa Stoute had been shot in the shoulder and that her hand, thumb, or fingers were somehow involved in her treatment. Mr. Melancon also overheard a conversation between his sister and his wife in which his sister stated Theresa Stoute was going to physical therapy and was in pain. In this way, Mr. Melancon also learned the woman's daughter had been shot.
It is clear from the attorneys' questioning of Mr. Melancon that he knew no details about the shooting of Charlotte Perry and Theresa Stoute. Neither did he know any details of the Vermilion Parish shooting. There is no indication this information alone would prejudice him to the point that he could not be a fair and impartial juror. See State v. Clark, 340 So.2d 208, 215 (La.1976), cert. denied, 430 U.S. 936, 97 S.Ct. 1563, 51 L.Ed.2d 782 (1977) (even where prospective juror knows victim of the offense the defense must show the juror's acquaintance with victim is such that it is reasonable to conclude it would influence the juror in arriving at a verdict to be a sufficient ground for a challenge for cause). The trial court did not abuse its discretion in refusing the defendant's challenge for cause.
Assignments of Error Nos. 19, 20, 21, 22
Juror Examination Issues
By these assignments, Bourque contends the prosecutor incorrectly explained the legal concepts of first degree murder, specific intent, and the intoxication defense for the prospective jurors and improperly used a chart in its explanation. The defendant argues the only correct method to convey these concepts to prospective jurors was to use the statutory definitions.
Defense counsel objected to the following statement made by the prosecutor as he explained the elements of first degree murder during voir dire:
The law also says that when this person has a specific intent to kill or inflict great bodily harm on more than one person, that's [sic] not necessary for the shootings to take place simultaneously.
Vol. 6, p. 1306.
The trial court overruled the defense's objection, rejecting defense counsel's suggestion to restrict the prosecutor to reading the definition of the crime in the statute.
Bourque contends the state incorrectly informed the prospective jurors the shootings and the criminal intent did not have to exist at the same time. For this proposition, the defendant relies on State v. Andrews, 452 So.2d 687, 689 (La.1984), where the court reduced a conviction for first degree murder to second degree murder after finding no rational trier of fact could have concluded beyond a reasonable doubt that the defendant, by firing at one person, actively intended to kill the person and another who was not present.
Andrews is distinguishable from the present case. The defendant in Andrews, *231 Reginald Andrews, went in search of two brothers with whom he had had a barroom fight earlier in the evening. Finding one brother, Andrews chased after him with a gun. The man escaped and no shots were fired. At another location, Andrews saw the other brother, whom he shot and killed.
This court has rejected the idea that LSA-R.S. 14:30(A)(3), defining first degree murder as occurring when the offender has a specific intent to kill or to inflict great bodily harm upon more than one person, must be interpreted solely as occurring by a defendant's single act, such as when a bomb explodes in a crowded building. Instead, this court has determined the legislature intended this type of first degree murder to include "those murderers who formed an intent to commit multiple killings and who did in fact create the risk of multiple deaths through a single act or a closely related series of acts that resulted in at least one death." State v. Williams, 480 So.2d 721, 727 (La.1985) (emphasis supplied); see also State v. Ward, 483 So.2d 578, 581-82 (La.1986), cert. denied 479 U.S. 871, 107 S.Ct. 244, 93 L.Ed.2d 168 (1986) (death penalty may be justified when a "single consecutive course of conduct" contemplates and causes the death of one person and great bodily harm to another). Thus, considering the jurisprudence, the prosecutor's explanation of first degree murder was a correct statement of the law.
In order to explain the concept of first degree murder to the jurors, the prosecutor prepared a chart. Defense counsel objected to its use, but the objection was overruled. The defendant argues the chart contained the statutory language and the jurisprudential language complained of above. The record shows the chart was not offered in evidence and its provisions were not transcribed for the record. As found supra, the chart presented only correct statements of statutory and jurisprudential law. Therefore, there was no prejudice to the defendant in the use of the chart.
The defendant contends the prosecutor incorrectly explained the defense of intoxication to a group of prospective jurors. The record shows the trial court instructed the prosecutor to change his wording as the explanation given was not technically correct.[11] Thus, the trial court corrected the error and the prospective jurors were properly informed.
The defendant contends the prosecutor incorrectly explained the concept of specific intent to a group of prospective jurors. Specifically, the prosecutor stated specific intent could be inferred by looking to the person's actions. The trial court overruled the defense's objection. There was no error in the trial court's action; this was a correct statement of law. See State v. Brooks, 505 So.2d 714, 717 (La.1987), cert. denied, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987) ("specific intent is a state of mind and, as such, it need not be proven as a fact, but may be inferred from the circumstances of the transaction and the actions of the defendant"); La.Code Evid. art. 404(B)(1).
The defendant contends the prosecutor also gave an incorrect instruction to a group of prospective jurors when trying to explain the concept of reasonable doubt. The prosecutor made the following statement:
That's right. I mean, that's what the law says. The [law] says we don't have to prove it beyond all doubt, but just beyond all reasonable doubt. There's very few things in life if you think about it you can come up with, well, I could *232 come up with a reason or an excuse, or, you know, speculating on something, but is it a reasonable
Vol. 6, p. 1492.
Defense counsel objected to the use of the word "speculating" as it might connote a lower burden of proof. At a bench conference, the prosecutor and defense counsel agreed on the use of the words "possible doubt." As with the objection to the prosecutor's statement regarding intoxication, the trial court was given an opportunity to correct the error and the prospective jurors were properly instructed on these concepts of law.
Assignments of Error Nos. 23, 24
Jury Procedure Issues
By these assignments, Bourque complains he was prejudiced by the trial court's method of numbering prospective jurors and in calling panels for examination. He claims Mark Hebert and Louis Wyatt, and unnamed others, failed to appear for jury duty on the date the jury venire assembled. In the meantime, the trial judge assigned numbers to prospective jurors in a random manner by drawing lots after the names were added to a box from sealed containers.
When these prospective jurors appeared, the trial judge assigned them the last available numbers rather than renumbering the entire venire. Defense counsel objected on the grounds this procedure violated the random selection provisions of the constitution. The trial judge overruled the objections.
The defendant also contends the manner in which prospective jurors were called in panels was prejudicial. Because of the large number of prospective jurors, one hundred and eighty-two[12], the trial judge allowed those prospective jurors who were further down the list to go home. They were instructed to contact the courthouse each evening and listen to a recorded message which would relay which prospective jurors should appear the following day. When a numbered juror was late, the trial judge would call the next numbered juror. When the absent prospective juror appeared, he or she was placed on the next panel for examination. Bourque complains this procedure was not random.
In a related argument, Bourque asserts it was prejudicial error for the trial court to fail to include a prospective juror, Mitchell Francis, in the selection process. Prospective juror Francis was assigned # 100. Evidently, he did not appear for voir dire examination on the day he was assigned and did not report to court until twelve persons had been selected for the jury. When questioned by the trial court, Mr. Francis asserted the court machine had not played a message. Defense counsel objected when it appeared the trial judge was going to place Mr. Francis and Mr. Collins George, who had also failed to appear on his scheduled day, on the next civil jury venire.[13] Ultimately, the trial court did not have to decide what to do with these potential jurors, since two alternate jurors were selected from the next panel questioned. Bourque claims prejudice.
La.C.Cr.P. art. 419 provides "[a] general venire, grand jury venire, or petit jury venire shall not be set aside for any reason unless fraud has been practiced, some great wrong committed that would work irreparable injury to the defendant, or unless persons were systematically excluded from the venires solely upon the basis of race." The defendant bears the burden of proving "fraud or that some irreparable injury was caused by the selection process." State v. Brown, 414 So.2d 726, 728 (La.1982); Lee, 559 So.2d at 1313. Bourque has failed to show the assignment of numbers to prospective jurors was anything other than random or that he suffered any prejudice in the method used by the trial court.
*233 La.C.Cr.P. art. 784 provides "[i]n selecting a panel, names shall be drawn from the petit jury venire indiscriminately and by lot in open court and in a manner to be determined by the court." Comment C provides that the details of how the panels are to be selected are left to the trial court's discretion. It was well within the trial court's discretion what number, and which numbers, were called to compose the various panels for examination.
A defendant is not entitled to a mistrial when allegations of prejudice are premised on the absence of prospective venirepersons which are not substantiated by evidence proffered as proof of the prejudice. State v. Badon, 338 So.2d 665, 667 (La.1976). Bourque offers no proof to show whether he was prejudiced by the trial court's failure to include Mr. Francis in the panel being questioned or how the prejudice occurred. Thus, the defendant does not state a merited claim on appeal.

GUILT PHASE

EVIDENTIARY MATTERS
Assignment of Error No. 25
Evidence of Other Crimes
Bourque contends it was reversible error for the trial court not to exclude any and all evidence concerning the March 17, 1990 incident at his residence. Specifically, the defendant argues the testimony of Mr. Perry that his daughter had been taken from her place of employment on this and another occasion was hearsay and beyond the scope of other crimes evidence for which he had been placed on notice. The defendant also argues the information regarding prior threats was not evidence of motive, plan, or intent under La.Code Evid. art. 404(B) and was not in compliance with State v. Prieur, 277 So.2d 126 (La.1973).
Generally, evidence of other crimes is inadmissible in the guilt phase of a trial unless the probative value of the evidence outweighs its prejudicial effect and unless other safeguards are met. State v. Hamilton, 478 So.2d 123, 129 (La.1985), cert. denied, 478 U.S. 1022, 106 S.Ct. 3339, 92 L.Ed.2d 743 (1986). This evidence is generally inadmissible because, in the determination of guilt or innocence, the admission of evidence of other crimes which the defendant has committed creates the risk the defendant will be convicted of the present offense simply because he is a "bad person." The defendant may not be prepared to face such attacks and the jury may become confused by the introduction of collateral issues. Prieur, 277 So.2d at 128. Thus, before the state can introduce evidence of other crimes, it is required to give the defendant advance notice such evidence will be offered. Prieur, 277 So.2d at 130.
An exception to the general rule of denying admissibility occurs where the state offers evidence of other crimes for purposes other than to show the character of the defendant. La.Code Evid. art. 404(B)(1) provides:
Except as provided in Article 412 [not relevant here], evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
Evidence which constitutes an integral part of the crime, formerly known as res gestae, is admissible without prior notice to the defense. La.C.Cr.P. art. 720; Prieur, 277 So.2d at 128.
The record shows the state notified the defendant of its intent to use evidence of the threats made by the defendant against Charlotte Perry and her father on March 17, 1990 in the guilt phase of the trial by its amended answer to a discovery motion filed October 30, 1990. This evidence was to be offered to show the intent of the *234 defendant at the time of the murder.[14]
A hearing was held pretrial to determine whether the stated evidence would be admissible in the guilt phase. After listening to the testimony of Mr. Perry and Deputy Stan Suire, the trial court ruled the prior threats admissible. At the trial, the state was careful not to elicit testimony regarding how Ms. Perry came to be at the defendant's trailer on March 17 or about any other occasion. It was only through defense counsel's cross examination that Mr. Perry revealed the defendant had taken the victim from her place of employment on this and on a prior occasion. On re-direct, the state inquired whether Ms. Perry had been visiting the defendant of her own free will on March 17. When Mr. Perry attempted to answer the question, the defense objected to the testimony on the grounds of hearsay. Although the state argued the defense had opened the door on this issue, the trial court sustained the hearsay objection.
Thus, the record shows the defendant was given proper notice under Prieur that the previous threats made by the defendant against the victim and her father were going to be presented. The evidence of the defendant and victim's prior relationship and the prior threats were relevant to show the defendant's motive and intent for the subsequent shooting. See State v. Welch, 615 So.2d 300, 302-03 (La.1993) ("the primary purpose of the evidence was not to prove [the defendant's] bad character but to illustrate the volatile nature of his relationship with the victim and his inability to put her behind him and `get on with his life.'").
As to Mr. Perry's testimony characterizing the defendant's actions as an abduction, and alluding to another incident in which the defendant abducted the victim, this testimony was elicited by defense counsel when counsel tried to characterize Mr. Perry's earlier testimony as showing the victim had been voluntarily "visiting" the defendant. There was, thus, no prosecutorial misconduct. La.C.Cr.P. art. 770. The trial court sustained defense counsel's objection when the prosecutor attempted to explore the subject further. Defendant can point to no error on the part of the state or by the trial court, and this court finds none.
Assignments of Error Nos. 26, 27
Statements of Other Crimes
The defendant asserts the trial court erred in failing to grant defense counsel's motions for mistrial. During the course of trial, two state witnesses testified the defendant made an oral inculpatory statement to them or in their presence to the effect the defendant "had just killed three people."[15] Bourque contends this was prohibited evidence of other crimes, as it referred specifically to the Fontenot shooting.
Under LSA-R.S. 15:450[16], a defendant is entitled to insist upon introduction of the entirety of a statement sought to be used against him but may waive this statutory right. The law is clear that when the state seeks to introduce a confession or statement of the defendant which contains other crimes evidence, the defendant has two options. State v. Morris, 429 So.2d 111, 121 (La.1983).
He may waive his right to have the whole statement used, object to the other crimes evidence, and require the court to excise it before admitting the statement; or, he may insist on his right to have the statement used in its entirety so as to receive any exculpation or explanation that the whole statement may afford. A *235 third alternative, that of keeping the whole statement out, is not available to defendant, unless, of course, the confession itself is not admissible.
Morris, 429 So.2d at 121; State v. Celestine, 443 So.2d 1091, 1096 (La.1983), cert. denied, 469 U.S. 873, 105 S.Ct. 224, 83 L.Ed.2d 154 (1984); State v. Sonnier, 379 So.2d 1336, 1355 n. 7 (La.1979).
The record shows the state saw the possible problem with these statements and filed a motion in limine to determine pretrial which option the defendant would choose. In the motion, the state suggested the witnesses be instructed to refer to the number of people as "some," rather than "three."
At the hearing on the motion in limine, the state reiterated its desire to safeguard the proceedings. Defense counsel objected to use of the word "some," but the only suggestion the defense offered to cure the problem was to keep the statements out of evidence altogether. The trial court appeared reluctant to "redraft" or "doctor" the inculpatory statements and took the matter under advisement. Both defense counsel and the prosecutor were instructed to present memos on the issue, but this was apparently not done and no ruling was made on the matter prior to trial.[17]
At trial, once the statement was elicited, defense counsel objected and moved for a mistrial. Outside the presence of the jury, the trial judge told counsel he was inclined to give the jury a Prieur instruction but otherwise felt the statement was admissible to show specific intent. Both the state and defense counsel agreed, however, on the inapplicability of Prieur. The defense objected to the statement and no instruction was given to the jury. The state elicited the statement again during questioning of Officer Reggio, to which the defense lodged another objection.
Although the trial court failed to make a ruling pretrial concerning the admissibility of the statements, it appears from the record the defendant did not waive his right to compulsory completeness or exercise his right to excise the other crimes evidence. Instead, he "sought exclusively a remedy the law does not afford, complete suppression of an otherwise admissible inculpatory statement." Morris, 429 So.2d at 121; Sonnier, 379 So.2d at 1355 n. 7. Because the statement was otherwise admissible, the trial court did not err in denying the motion for mistrial. Comeaux, 514 So.2d at 96.
Assignment of Error No. 29
Res Gestae Evidence
Bourque contends the trial court erred in allowing the introduction of any evidence concerning the shooting of Mrs. Stoute, as this was evidence of other crimes.[18] He claims several problems were raised when the state decided to sever its charge of attempted first degree murder regarding the shooting of Mrs. Stoute from the charge of first degree murder for the killing of Charlotte Perry. Specifically, he argues he was unable to take the stand and testify in the first degree murder trial for fear he would be cross-examined about the events surrounding the attempted first degree murder for which he had not been tried.
The evidence regarding the shooting of Mrs. Stoute was admissible under La.Code Evid. art. 404(B)(1) to prove the specific intent to kill more than one person necessary to a finding of first degree murder. In addition, the shooting of Mrs. Stoute was an integral part of the killing of Ms. Perry. Thus, whether the charges of first degree murder and attempted first degree murder were severed or not makes no difference since the evidence regarding Mrs. Stoute's injuries was admissible in the first degree murder trial under Art. 404(B)(1). The trial court committed no error in admitting this evidence. La.C.Cr.P. art. 720; *236 Prieur, 277 So.2d at 128 (res gestae evidence admissible).
Assignments of Error Nos. 30, 31, 32, 33, 34, 35, 36, 37, 38
Physical Evidence
By these assignments, the defendant argues the trial court erred in allowing in evidence certain photographs of the victim and her mother as well as certain items of clothing worn by the two women. The defendant argues the question of whether he killed Charlotte Perry and wounded Mrs. Stoute was not at issue as it was admitted by defense counsel in opening argument. Since the fact of and cause of death were not at issue, the defendant contends the gruesome nature of the pictures only prejudiced the jury. In particular, the nightgown of Mrs. Stoute was irrelevant and inflammatory, considering the defendant was not on trial for the shooting of Mrs. Stoute. Immediately prior to trial, the defense objected to several of the photographs. While the trial court found some of them to be gruesome, it found the pictures' probative nature outweighed any prejudicial effect.
The photographic exhibits complained of are 11" × 14" color photographs mounted on poster board which show the following:
S-1: A close-up, autopsy photograph depicting the head and left hand of the victim, showing the defensive wound in the hand and the penetration of the head;
S-8C A medium-distance, autopsy photograph depicting the exit wound in the victim's back;
S-8A A photograph at the scene depicting the victim from the front, wearing a long nightgown and socks, lying as found on the driveway and showing the location of spent shell casings;
S-8B A photograph at the scene depicting the victim from the back, wearing a long nightgown and socks, lying as found on the driveway and showing the location of spent shell casings;
S-6 A photograph depicting the living room of the Stoute residence and showing a blood stain on the floor;
S-21A A photograph depicting Mrs. Stoute, wearing a nightgown, lying on her living room floor, after she had been rolled over. Although there is blood in the picture, there is no clear view of the wounds.
The admission of gruesome photographs will not be overturned unless it is clear the prejudicial effect of the photographs outweighs their probative value. State v. Lindsey, 543 So.2d 886, 894-95 (La.1989), cert. denied, 494 U.S. 1074, 110 S.Ct. 1796, 108 L.Ed.2d 798 (1990); State v. Eaton, 524 So.2d 1194, 1201 (La.1988), cert. denied, 488 U.S. 1019, 109 S.Ct. 818, 102 L.Ed.2d 807 (1989). "This court will not find that photographs were admitted in error unless they are so gruesome as to overwhelm the jurors' reason and lead them to convict the defendant without sufficient other evidence." Copeland, 530 So.2d at 543; Eaton, 524 So.2d at 1201. The fact the photographs are gruesome does not, in and of itself, prevent their admissibility. Comeaux, 514 So.2d at 97.
Post-mortem photographs at the scene or autopsy photographs of murder victims are admissible to prove corpus delicti, to provide positive identification of the victim, to corroborate other evidence establishing the cause of death, the manner in which death occurred, and the location, severity, and number of wounds. Copeland, 530 So.2d at 543; Eaton, 524 So.2d at 1201; Comeaux, 514 So.2d at 96-97. This court has held "the defendant cannot deprive the State of the moral force of its case by offering to stipulate to what is shown in photographs." State v. Perry, 502 So.2d 543, 559 (La.1986), cert. denied, 484 U.S. 872, 108 S.Ct. 205, 98 L.Ed.2d 156 (1987); State v. Harvey, 358 So.2d 1224, 1229 (La. 1978).
We find the photographic evidence offered was relevant and probative in proving the state's case against the defendant. La.Code Evid. art. 403. Although the autopsy photographs of the victim were graphic, they helped establish the cause of death and the victim's attempt to defend herself. Compare Perry, 502 So.2d at 558 *237 (color photographs of five victims shot in the head showing destruction of the skulls found held admissible); Copeland, 530 So.2d at 542-43 (color photograph depicting child's head which had been partially blown away by shotgun blast held admissible). The photographs of the victim at the scene corroborated the testimony of law enforcement officers as to the location of spent shell casings, the location of the victim, and the manner in which she died. Considering the distance at which these photographs were taken, they were not gruesome. Compare Comeaux, 514 So.2d at 96 (photographs of two victims; one lying face down in pool of blood; the other lying face up, almost completely nude, with smears of blood on the body, held admissible).
The photograph of Mrs. Stoute helped to establish the serious nature of her injuries. This was necessary to show the defendant's intent to kill or to cause great bodily harm to her and was essential for a finding that the defendant had the intent to kill more than one person when he killed Ms. Perry. The fact that Mrs. Stoute had been rolled over and was not lying face down as she testified she was directly after the shooting does not detract from the overall relevance of the photograph.
The photograph of Mrs. Stoute's living room with the bloodstain on the floor corroborates Mrs. Stoute's testimony of her struggle with the defendant in trying to keep him from taking her daughter out of the house and her description of where in her house she was shot.
As to the nightgowns worn by the women and introduced in evidence at trial, the record shows state offered to stipulate Mrs. Stoute's nightgown was in an evidence bag and to not show the garment to the jury. The defense objected to the introduction of the gown at all on grounds of relevance and prejudice. The trial court allowed the garment admitted and displayed to the jury, finding the nightgown relevant to the question of specific intent and further finding display of the garment was preferable to having Mrs. Stoute disrobe to show her injury. The state offered the same stipulation to the defense for the clothing worn by Charlotte Perry. The defense refused to stipulate, again citing relevance and prejudice as grounds. After argument outside the presence of the jury, the trial court overruled the defense's objections and permitted the introduction of the nightgowns.
This court has held the relevancy of the clothing of a victim "is self-evident and needs no discussion." Copeland, 530 So.2d at 543 (citation omitted). Although there was blood on the garments at the location of the womens' injuries, this would not be sufficient to overwhelm a juror's reason. The trial court did not err in its rulings.
Assignments of Error Nos. 39, 40
Testimonial Evidence
By these assignments, Bourque contends it was prejudicial error for the trial court to qualify the state's witness, Christopher Henderson, as an expert in firearms and blood spatters. He also argues he was prejudicially surprised by the testimony of the surgeon who treated Mrs. Stoute, Dr. Broussard.
La.Code Evid. art. 702 provides:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
Trial courts are vested with great discretion in determining the competence of an expert witness, and rulings on the qualification of a witness as an expert will not be disturbed unless there was an abuse of that discretion. State v. Trahan, 576 So.2d 1, 8 (La.1990).
The record shows Christopher Henderson, who worked at the Acadiana Crime Lab, was initially qualified as an expert in forensic chemistry after detailing his experience and training. Included in this discussion was a description of Henderson's continuing education and training which covered yearly training on firearms and trace evidence. Henderson *238 had previously been qualified as an expert in all eight parishes served by the Acadiana Crime Lab and had never been refused qualification as an expert.
Henderson related he went to the Stoute household to view the scene. When he mentioned there appeared to be high velocity blood splatters in the living room, defense counsel objected on the basis Henderson was not qualified to testify as an expert in the area of blood splatters. Further questioning as to Henderson's training in this area elicited the response the witness had been previously qualified to testify in this area. He attended a week long school on blood splatters and their relevance to crime scenes given by one of the leaders in the field. Henderson testified he had continued his education in the area since that time. The trial court then qualified him as an expert in the field of blood splatters. Henderson thereafter related the location of blood splatters in the Stoute living room.
Later, the state asked Henderson what type of testing he performed on the weapons and the shell casings recovered at the Stoute residence. Defense counsel objected. On further questioning by the state as to his experience and training, Henderson restated his primary field at the lab was in the area of trace evidence and ballistics or firearms identification. The state reiterated Henderson had been qualified as an expert in such in each parish covered by the crime lab and that Henderson had never been refused qualification. The defense had no questions and the trial court accepted Henderson as an expert in the field of ballistics and firearms.
Henderson then testified the shell casings recovered at the scene had been fired from the 9 MM pistol discovered in Bourque's vehicle. He stated the lead fragments and wadding found in the Stoute residence were consistent with having been shot out of the shotgun found in Bourque's possession. He also determined the pistol which shot Charlotte Perry had been held six to twenty-four inches away from her when the shots were fired.
As to Henderson's qualification as a firearms and ballistics expert, the record shows there was no abuse of discretion by the trial court. Henderson's primary fields were trace evidence and ballistics. He received continuing, yearly training in this field. In addition, he had been qualified as an expert in each parish which the crime lab served and had never been refused expert qualification.
Although Henderson's qualifications as an expert in blood splatters were not as extensive, the record reveals no reversible error occurred in accepting him as an expert. Henderson testified only as to the location of blood splatters. No specialized knowledge was needed for this testimony; any fact witness could have done the same. Henderson did not provide any expert opinion relating to this testimony, for example, the origin of the splatters, the distance traveled, or the speed of the splatters. Thus, even assuming the trial court erred in qualifying Henderson as an expert in this field, no prejudicial error resulted. Although the defendant claims the testimony regarding the blood splatters was introduced solely to inflame the jury, the evidence did help corroborate Mrs. Stoute's testimony that the direction of the shotgun blast was upward.
Defendant's additional contention that the testimony linking the spent casings to the defendant's weapon was irrelevant and cumulative is also meritless as the evidence was relevant to proving the defendant was guilty of the charged offense.
The defendant argues the trial court erred in allowing Dr. Broussard, the surgeon who operated on Mrs. Stoute, to testify regarding her injuries. He complains the state failed to answer a discovery motion seeking this information and failed to give the defense notice this witness would testify.
The record shows the defense did request the identity of all expert witnesses who would testify at trial in a pretrial motion. The state's answer claimed it was not required to provide this information. Although the defense was allowed time *239 after the hearing to submit further motions and to file objections to the state's answer for discovery, none were filed.
When Dr. Broussard was called at trial, the defense objected and claimed surprise. The state argued the doctor was on its witness list. In addition, the state argued it had received no reports from the doctor and had spoken to him for the first time the morning he was to testify. The trial court overruled the objection, noting no discoverable reports had been generated by the witness. The trial court found the doctor's testimony to be relevant to the issue of specific intent to kill or inflict great bodily harm on more than one person. Defense counsel did not ask for a recess, continuance, or mistrial.
Under La.C.Cr.P. art. 719, on motion of the defense the trial court must order the state to allow the defendant to obtain reports of examinations and tests which will be used at trial. Any exculpatory evidence must be produced even if it is not intended to be used at trial. As noted by the trial court, no reports were generated by this expert; thus, no technical violation of this statute occurred.
Considering the extent of Mrs. Stoute's injuries, the defense's claim of surprise regarding this witness is not well taken. However, even assuming the state's discovery responses were deficient, "exclusion of evidence or declaration of a mistrial are not required in all cases of discovery violations." Jones, 474 So.2d at 928; State v. Williams, 448 So.2d 659, 664 (La.1984) ("the failure of the state to comply with the discovery procedure will not automatically command reversal"); La. C.Cr.P. art. 729.5.[19] The defendant must show actual prejudice resulted from the discovery violation. Jones, 474 So.2d at 928; Williams, 448 So.2d at 664. Defendant argues the testimony was irrelevant because the cause and extent of Mrs. Stoute's injuries were never in dispute; therefore he claims the testimony was prejudicial in that it only served to inflame the jury.
In his testimony, Dr. Broussard described Mrs. Stoute's injuries. He testified that although no artery was severed, she could have died from loss of blood had she not received treatment in time. In addition, the doctor testified that had Mrs. Stoute been shot by a shotgun blast at the same distance in the throat, she would have been killed promptly. This information was relevant to the issue of specific intent.
Mrs. Stoute had already testified as to her injuries. The doctor's testimony in this regard was, thus, cumulative. A review of the testimony shows it was not unduly inflammatory. Furthermore, because the defendant can show no specific prejudice he suffered as a result of the doctor's testimony, any discovery error in failing to provide the doctor's name in pretrial is harmless.
Assignments of Error Nos. 41, 42, 43
Closing Arguments
By these assignments, Bourque contends the prosecutor made improper remarks during closing argument in the guilt phase of trial regarding the defendant's failure to testify or to put on a defense which require the reversal of his conviction.
The defendant argues the prosecutor made an indirect reference to his decision not to testify in the following instance:
PROSECUTOR: ... I don't think there's any doubt that Mr. Bourque attempted to forcibly seize and carry Charlotte Perry out of her residence and away from her home. There's been absolutely no evidence to contradict the statements of Ms. Stoute, Mr. Perry, the brother of Ms. Perry *240 DEFENSE COUNSEL: Excuse me. Judge, we need to approach the bench.
Vol. 16, pp. 3842-43.
At a bench conference the defense moved for a mistrial, which was overruled. The defendant claims that, since he was the only other person at the scene, and the only other person who had knowledge of the events, this statement was a comment on his failure to testify.
A defendant relies on the Fifth and Fourteenth Amendments to the U.S. Constitution to protect his right against self-incrimination by forbidding the prosecution to comment on the defendant's failure to take the stand. See Lee, 559 So.2d at 1320. In addition to this federal protection, state law provides for a mandatory declaration of mistrial if the prosecutor refers directly or indirectly to the failure of the defendant to testify in his own defense. La.C.Cr.P. art. 770(3). The purpose behind the rule "is to prevent attention from being drawn to the fact that the defendant has not testified in his own behalf," and to prevent the jury from drawing unfavorable inferences from the fact. State v. Fullilove, 389 So.2d 1282, 1284 (La.1980).
Under the statutory rule, where the prosecutor makes a direct reference to a defendant's failure to take the stand, a mistrial must be declared. In that event, the Court will not attempt to determine what effect the statement had on the jury. State v. Johnson, 541 So.2d 818, 822 (La. 1989); Fullilove, 389 So.2d at 1284.
Where the prosecution makes a reference to a defendant's failure to take the stand which is indirect, this Court tries to determine the remark's intended effect on the jury, "to distinguish indirect references to the defendant's failure to testify (which are impermissible) from general statements that the prosecution's case is unrebutted (which are permissible)." Johnson, 541 So.2d at 822; Fullilove, 389 So.2d at 1284. "A statement that the state's evidence is uncontradicted is not necessarily a prohibited comment on defendant's failure to testify." State v. Jackson, 454 So.2d 116, 118 (La.1984).
In order to determine the prosecutor's intent, this Court has held "in cases where the prosecutor simply emphasized that the state's evidence was unrebutted, and there were witnesses other than the defendant who could have testified on behalf of the defense but did not do so, we have held that the prosecutor's argument did not constitute an indirect reference to the defendant's failure to take the stand." Johnson, 541 So.2d at 822 (emphasis in original). "On the other hand, where the defendant is the only witness who could have rebutted the state's evidence, `a reference to the testimony as uncontroverted focuses the jury's attention on the defendant's failure to testify' and mandates a mistrial." Id., (citation omitted).
The record shows there was another witness who had knowledge of the event referred to by the prosecutor besides the defendant, Mrs. Stoute, Kenneth Perry, or Michael Perry. Carroll Romero was in the Stoute residence and observed the defendant's attempts to pull Charlotte Perry to his car, her attempts to fight off the defendant, and the defendant's subsequent shooting of her. Since there was at least one other witness besides the defendant who could have rebutted the testimony referred to by the prosecutor, the defendant is incorrect in contending the prosecutor's remark was an indirect comment on his failure to testify. See Johnson, 541 So.2d at 822; Jackson, 454 So.2d at 118.
In addition, it is clear the prosecutor's comments were not intended to focus the jury's attention on the failure of the defendant to testify. State v. Smith, 433 So.2d 688, 697 (La.1983). "Instead, the comments were directed to the events of the crime which the defense did not contest." Lee, 559 So.2d at 1321 (where prosecutor argued the events of the crime known only to the defendant and two others showed premeditation). The defense did not contest the events of this crime. Defense counsel admitted in opening argument the defendant "caused the sorrow, *241 the pain, and the suffering that occurred [at the Stoute residence] on April the 15th, 1990." In closing argument the defense did not deny the defendant shot and killed Charlotte Perry while trying to maneuver her into his car or that the defendant shot and wounded Mrs. Stoute. Instead, the defense only argued what interpretation should be placed on those actions.[20]
In a related argument, the defendant contends the prosecutor's references in closing argument to the defense of intoxication, when the defense had presented no evidence in the guilt phase regarding intoxication, was a comment on the defendant's failure to present evidence or to present a defense. During argument, the prosecutor stated:
... What was in his mind? What was he concerned about then? He was concerned about getting away from what he had just done. He put his two weapons in the car, started his car, and where did he go? Did he go back to where he lived? No. He drove all the way to Metairie, Louisiana. This man that was intoxicated. The defense of intoxication. You remember, he drove all the way from Gueydon [sic] over here, did all those things, drove all the way to Metairie, but the defense is intoxication.
Vol. 16, p. 3865.
Defense counsel objected, arguing the prosecutor's comment was a comment on the fact the defense did not produce any evidence relative to the defense of intoxication. The trial court stated the defense of intoxication was still viable and noted it was going to give a jury instruction on the matter. The objection was overruled.
Under La.C.Cr.P. art. 774, closing arguments should be restricted "to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case. The argument shall not appeal to prejudice." See State v. Messer, 408 So.2d 1354, 1356 (La.1982). Generally, before a verdict will be overturned on the basis of improper argument, the reviewing court must be convinced the jury was influenced by the remarks and the remarks contributed to the verdict. State v. Moore, 432 So.2d 209, 220 (La.1983), cert. denied, 464 U.S. 986, 104 S.Ct. 435, 78 L.Ed.2d 367 (1983); Messer, 408 So.2d at 1357.
The record shows the defense filed a notice of intent to advance the defense of intoxication. In addition, the defense spoke about intoxication and the jurors' attitudes about it throughout voir dire. The defense now claims the intoxication defense was to be used only at penalty phase, and thus, it was error for the state to discuss the defense at the guilt phase.
Although the defense did not argue the defense of intoxication in either its opening or closing arguments at the guilt phase of the trial, the issue was nevertheless raised through questioning of witnesses. Defense counsel elicited testimony regarding the defendant's consumption of alcohol during cross-examination of bar owner, Terry Loignon. On direct examination, the prosecutor questioned Cheryl Oberg, the bartender at The Barn Lounge, about the drink she served the defendant. The defense followed up questioning her about the issue on cross-examination. The trial court charged the jury on intoxication as a defense in its jury instructions. In addition, the jury was also instructed the defendant *242 did not have to call witnesses or produce any evidence.
The prosecutor's argument referring to the defense of intoxication was a proper comment regarding evidence, or lack of evidence, raised at trial. In addition, there is no indication the jurors were improperly influenced by the remark or that the remark prejudicially contributed to the verdict.
Assignment of Error No. 44
Verdict
Bourque contends the evidence was insufficient to support the verdict of guilty of first degree murder under either LSA-R.S. 14:30(A)(1) or LSA-R.S. 14:30(A)(3).
Specifically, he claims there was insufficient evidence to prove he killed the victim while engaged in an attempted aggravated kidnapping. He claims the evidence, at most, supports a finding he was engaged in committing a second degree kidnapping or a simple kidnapping.[21] He also claims the state failed to prove he had the specific intent to kill or inflict great bodily harm to more than one person. He points to the fact he did not kill Michael Perry despite opportunity and the fact Mrs. Stoute did not die.
"Due process requires that a criminal defendant be convicted only upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." State v. Tassin, 536 So.2d 402, 409 (La.1988), cert. denied, 493 U.S. 874, 110 S.Ct. 205, 107 L.Ed.2d 159 (1989); In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); LSA-R.S. 15:271. In reviewing the sufficiency of the evidence supporting a conviction, this court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
The state alleged the defendant committed first degree murder either by violating LSA-R.S. 14:30(A)(1), by killing Charlotte Perry during the commission of an attempted aggravated kidnapping, or by violating LSA-R.S. 14:30(A)(3), by killing Charlotte Perry with the specific intent to kill or inflict great bodily harm upon more than one person.
In order to prove the crime of first degree murder committed under R.S. 14:30(3), the state was required to prove two elements: 1) the defendant killed the victim; and 2) the defendant had the specific intent to kill or to inflict great bodily harm upon more than one person.
The state proved beyond a reasonable doubt the defendant killed Charlotte Perry. Both Michael Perry and Carroll Romero saw the defendant shoot Charlotte Perry several times on the sidewalk in front of her home. The coroner testified the multiple gunshot wounds caused the chest cavity of the victim to fill with blood, leading to cardiac arrest.
The defendant contends the state failed to prove the second element, however, because he did not have specific intent to kill both Charlotte Perry and her mother. He again relies on State v. Andrews, 452 So.2d 687, 689 (La.1984), where the court reduced a conviction for first degree murder to second degree murder after finding no rational trier of fact could have concluded beyond a reasonable doubt that the defendant, by firing at one person, actively intended to kill that person and another.[22]
As stated previously,[23] this court has rejected the idea that R.S. 14:30(A)(3) must *243 be interpreted solely as occurring by a defendant's single act, such as when a bomb explodes in a crowded building. Instead, this court has determined the legislature intended this type of first degree murder to include "those murderers who formed an intent to commit multiple killings and who did in fact create the risk of multiple deaths through a single act or a closely related series of acts that resulted in at least one death." Williams, 480 So.2d at 727 (emphasis supplied); see also Ward, 483 So.2d at 581-82 (death penalty may be justified when a "single consecutive course of conduct" contemplates and causes the death of one person and great bodily harm to another).
The state may, thus, prove the second element of R.S. 14:30(A)(3) by proving the defendant, with specific intent to kill or cause great bodily harm, killed one person and caused great bodily harmto another if the actions were committed in a single consecutive course of conduct. In this case, the evidence supports that finding. From the time the defendant began struggling in the hallway of the Stoute residence with Ms. Perry and Mrs. Stoute until he fatally shot Ms. Perry outside the house, the defendant was engaged in a single consecutive course of conduct.
The state bore its burden of proving specific intent to kill or to inflict great bodily harm to both women. "A specific intent to kill can be inferred from someone pointing a gun at close range and pulling the trigger." Tassin, 536 So.2d at 411. The crime lab expert testified one of the gunshots was fired at Ms. Perry from a range of six to twenty-four inches away. Although the defendant claims he did not have the specific intent to injure Mrs. Stoute and only pointed the shotgun at her to cease her interference, the evidence shows it was only Mrs. Stoute's instinctive reaction to push the shotgun away from her throat as the defendant pulled the trigger that saved her from an immediate death. There was no evidence the defendant tried to render aid or contact medical personnel which would tend to show the alleged accidental nature of the shooting. Thus, the state proved all the elements necessary to prove the defendant committed first degree murder under R.S. 14:30(A)(3).
Finding that the state presented sufficient evidence to prove first degree murder under R.S. 14:30(A)(3), it is unnecessary to determine if the evidence supported a finding of first degree murder under R.S. 14:30(A)(1), as well. See Copeland, 530 So.2d at 540-41 (conviction for first degree murder upheld where state failed to prove existence of one predicate felony but did establish killing occurred during commission of a second predicate felony).
Assignments of Error Nos. 45, 46, 47
Jury instructions
Bourque contends the trial court committed reversible error in giving a confusing jury instruction on reasonable doubt and in giving an incorrect instruction on "direct" and "circumstantial" evidence at the close of the guilt phase of trial.
As to the reasonable doubt instruction, the trial court gave the following instruction:
The burden is on the State to prove the defendant's guilt beyond a reasonable doubt. In considering the evidence, you must give the defendant the benefit of every reasonable doubt arising out of the evidence or lack of evidence. If you're not convinced of the guilt of the defendant beyond a reasonable doubt, you must find him not guilty.
While the State must prove guilt beyond a reasonable doubt, it does not have to prove guilt beyond all possible doubt. Reasonable doubt is a doubt based on reason and common sense, and is present when, after you have carefully considered all of the evidence, you cannot say that you are convinced of the guilt of the defendant.
If two conclusions can be reasonably drawn from the evidence, one of innocence *244 and one of guilt, the jury must adopt the one of innocence.
Now, you must determine the facts only from the evidence presented in Court. The evidence which you should consider consists of the testimony of the witnesses and the exhibits which the Court permitted to be introduced into evidence.
You must not consider any evidence which was not admitted, or which you were instructed to disregard, or to which an objection was sustained.
Vol. 16, pp. 3892-93.
The defendant complains that after instructing the jury to consider the "lack of evidence" in its determination of reasonable doubt, the jury was then instructed it could determine facts "only from the evidence presented in court." The defendant argues this is misleading. He contends the jury may have held it against him that he did not present evidence or take the stand in his own defense. The defendant asserts the jurors might also have thought the state's unrebutted evidence was necessarily an accurate depiction of events. He claims this error could not have been harmless.
Under La.C.Cr.P. art. 801, a party may not assign as error any jury instruction or failure to give an instruction unless a specific objection is made before the jury retires to deliberate or within such time as would give the court a reasonable opportunity to cure the alleged error. The record shows the defendant failed to object to the instruction on reasonable doubt on these grounds.[24] The lack of a contemporaneous objection precludes the defense from asserting the error on appeal. Failure to bring the alleged error to the attention of the trial judge prevented the judge from correcting the error. State v. Leblanc, 506 So.2d 1197, 1201 (La.1987); State v. Simmons, 443 So.2d 512, 521 (La.1983); State v. Lee, 343 So.2d 1060, 1061 (La.1977) (in the absence of contemporaneous objection, the defendant's complaint that the jury charge was confusing does not present an issue reviewable on appeal). See also La. C.Cr.P. art. 841.
Even assuming the alleged error was preserved for appeal, the defendant's arguments are meritless. "In analyzing jury instructions, our cases caution against taking certain phrases out of context of the charge as a whole." State v. West, 568 So.2d 1019, 1023 (La.1990). The proper test for determining the correctness of a jury instruction is "whether, taking the instruction as a whole, reasonable persons of ordinary intelligence would understand the charge." Id.
The trial judge properly instructed the jury as to reasonable doubt. In addition to the questioned instruction, the jurors were instructed not to single out any instruction and disregard others. The jurors were instructed the defendant was not required to prove his innocence, to put on witnesses, to produce evidence, or to testify. Further, the trial judge instructed "[n]o presumption of guilt may be raised, and no inference of any kind may be drawn from the fact that the defendant did not testify."[25] Reading the jury charge as a whole, it is clear persons of ordinary intelligence would have understood the charge.
The defendant also complains of the jury instruction regarding direct and circumstantial evidence. The trial judge instructed the jury as follows:
Now, evidence is either direct or circumstantial. Direct evidence is evidence which, if believed, proves a fact. Circumstantial evidence or indirect evidence is evidence which, if believed, proves a fact, and from that fact you may logically and reasonably conclude that another fact exists.

*245 You cannot find a defendant guilty solely on circumstantial evidence unless the facts proved by the evidence exclude every reasonable hypothesis of innocence.
Vol. 16, pp. 3894-95.
The defendant objected, asking that the words "if believed" be stricken and replaced by "proven beyond all reasonable doubt." The defendant argues on appeal the instruction as given lessened the standard of proof.
It should be noted initially that the trial judge's charge on direct and circumstantial evidence is a direct quote of the charge suggested in Louisiana Jury Instructions, Criminal-Civil Section 3.6.[26] This information is also contained in the Louisiana Judges' Bench Book.[27] As the editors' note to both sources reveals,
[t]he first paragraph attempts to distinguish direct evidence from circumstantial evidence. See Cleary et al, McCormick on Evidence, § 185 West (2nd Ed.1972); Wigmore, Law of Evidence, § 25 Little, Brown and Company (3rd Ed.1940).
The second paragraph is taken directly from La.R.S. 15:438 and states the rule to be applied when the state's case depends on circumstantial evidence. See State v. Smith, 339 So.2d 829 (La.1976); State v. Elzie, 343 So.2d 712 (La.1977); State v. Allen, [129 La. 733] 56 So. 655 (La.1911).
The charge given was a correct statement of the law. See State v. Davenport, 445 So.2d 1190, 1196 (La.1984) (special charge unnecessary where this definition was correct statement of law in general charge). In addition, the trial judge instructed the jury the state had to prove its case beyond a reasonable doubt. Thus, the jurors were instructed as to the proper standard of proof.

PENALTY PHASE
Assignments of Error Nos. 28, 48, 49
Evidence of Unadjudicated Crimes
By these assignments, Bourque presents multiple arguments contending the trial court committed reversible error by allowing evidence of other crimes, specifically the Vermilion Parish shooting of Jasper Fontenot and including an autopsy photograph of Fontenot, to be admitted in the penalty phase of the trial. At the time of trial, Bourque had been charged with but not convicted of Fontenot's murder.
The defendant claims there is no statutory basis to allow the introduction of this evidence and the state may do so only within the context of the specific aggravating factors listed at LSA-C.Cr.P. art. 905.4.
Even if no error was committed in introducing the evidence, the defendant claims prejudice by its introduction in this case because the evidence: 1) did not meet the criteria of State v. Brooks, 541 So.2d 801 (La.1989); 2) was inherently prejudicial; 3) was unrelated to the shooting of Charlotte Perry and her mother; 4) gave him no chance to rebut expert testimony because he did not receive adequate prior notice; 5) infringed on his Fifth Amendment right not to incriminate himself in a future prosecution; 6) was only proper rebuttal evidence; and 7) was not truly indicative of his character and propensities, as the events of the evening in question were isolated, unrelated incidences in his life.
Admissibility of Other Crimes Evidence in Penalty Phase
The character of a defendant convicted of first degree murder is automatically at issue in the sentencing phase of the trial, whether the defendant has placed character in issue or not. State v. *246 Jackson, 608 So.2d 949, 953 (La.1992); State v. Jordan, 440 So.2d 716, 719 (La. 1983); La.C.Cr.P. art. 905.2. This court has previously determined the enumerated aggravating circumstances of La.C.Cr.P. art. 905.4 should not be considered as limiting the scope, or controlling the admissibility, of the sentencing hearing's inquiry into a defendant's character. Rather, the purpose behind Art. 905.4 is to require the jury to find one of the specified aggravating circumstances exists beyond a reasonable doubt before the jury may consider imposing a sentence of death. Jackson, 608 So.2d at 953-54; La.C.Cr.P. art. 905.3. "As long as one statutory aggravating circumstance is proved, the prosecutor can introduce other evidence relevant to and probative of the circumstances of the murder and the character and propensities of the murderer." Jackson, 608 So.2d at 954.
This court has held that evidence of unrelated, unadjudicated crimes constitutes relevant and probative evidence of the defendant's character and propensities. Jackson, 608 So.2d at 954-56; Brooks, 541 So.2d at 813; see also Ward, 483 So.2d at 588. In Brooks, the court held evidence of unadjudicated crimes was admissible at the sentencing phase of a trial once the trial court determines: "1) the evidence of defendant's connection with commission of the unrelated crimes is clear and convincing; 2) the proffered evidence is otherwise competent and reliable; and 3) the unrelated crimes have relevance and substantial probative value as to the defendant's character and propensities, which is the focus of the sentencing hearing under La.C.Cr.P. art. 905.2." Id., 541 So.2d at 814.
In Jackson, this court reaffirmed the holding of Brooks, but placed limitations on the type of evidence of unadjudicated crimes that could be introduced at the penalty phase. The court limited evidence of unadjudicated crimes "to that which involves violence against the person of the victim," and "to that conduct for which the period of limitation for instituting prosecution had not run at the time of the indictment of the accused for the first degree murder for which he is being tried." Jackson, 608 So.2d at 955.
In this case, the state gave notice of its intent to introduce evidence of the Fontenot shooting in its amended answer to defendant's motion for discovery filed October 30, 1990. On January 18, 1991, the trial court held a hearing and determined the evidence of other crimes was admissible should the case proceed to a penalty phase after conviction for first degree murder.[28] Thus, the defendant received proper notice the unadjudicated evidence would be presented at his sentencing hearing.[29]Hamilton, 478 So.2d at 132 ("fundamental fairness dictates that an accused receive adequate prior notice that evidence of unrelated criminal activity may be offered by the prosecutor in an effort to punish him for the charged crime").
The evidence of the shooting of Jasper Fontenot satisfied all the criteria of Brooks as well as the limitations expressed in Jackson. At a pretrial hearing, the trial judge determined the evidence to be admissible, specifically finding the evidence relevant to the defendant's character and propensities. The Fontenot shooting was a crime of violence against a person and was committed within the time restrictions articulated in Jackson.
Although the Fontenot shooting was unrelated to the shooting of Charlotte Perry and Theresa Stoute, it was relevant evidence of Bourque's character and propensities. Jackson, 608 So.2d at 955 ("crimes of violence against the person indicate moral qualities and character traits pertinent to the propensity to commit first degree murder").
*247 The defendant's assertion that he was not prepared to rebut or address any expert testimony also lacks merit. The defendant was aware of the testimony of the state's forensic and firearms expert since it was offered at a pretrial hearing. The only other expert witness the state presented at the sentencing hearing was the doctor who performed Fontenot's autopsy. The doctor testified only as to the cause of Fontenot's death. The defendant does not assert what information he would have which would have rebutted that evidence.
The defendant contends his Fifth Amendment right against self-incrimination was violated by introduction of the other crimes evidence. Bourque complains he could not contest any evidence of the Vermilion Parish shooting without having these statements used against him at a future criminal proceeding. No Fifth Amendment violation occurred here; Bourque's assignment of error is premature. The purpose of the Fifth Amendment's protection against self-incrimination protects a defendant from being compelled to testify. In this case, the defendant did not take the witness stand. The defendant's Fifth Amendment right would only have been activated had he testified, and had that testimony been used at a subsequent criminal proceeding. To the extent the potential use of his penalty phase testimony at a later trial compelled him not to testify, the only constitutional right implicated is one of due process. In Jackson, this court held due process is not violated where the clear and convincing standard of Brooks is met, and the jury's sentencing discretion is further limited so arbitrary factors are not considered.[30]Jackson, 608 So.2d at 955.
Due to the lack of other evidence of violent crime, the jury was aware the shootings of Charlotte Perry, Theresa Stoute, and Jasper Fontenot were isolated incidences in the defendant's life.
Other Crimes Evidence Injected Arbitrary Factor
Although the defendant's arguments complaining of the admissibility of the evidence of the Fontenot shooting lack merit, and we find the evidence was fully admissible under both Brooks and Jackson, we must conclude an arbitrary factor was injected into the sentencing proceedings in this case which invalidated the jury's subsequent recommendation of the death penalty.
La.C.Cr.P. art. 905.9 requires this court to review every sentence of death to determine if it is excessive. In making this determination, the court examines (1) whether the sentence was imposed under the influence of passion, prejudice or other arbitrary factors; (2) whether the evidence supports the finding of a statutory aggravating circumstance; and (3) whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. See Louisiana Supreme Court Rule 28.[31]
A jury's discretion to impose a sentence of death must be "suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." Gregg v. Georgia, 428 U.S. 153, 189, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976). While this court has determined the state may present evidence of unrelated unadjudicated crimes charged against a defendant in order to show the defendant's character and propensities, that authority is not unlimited. *248 In Jackson, this court imposed restrictions on this type of evidence "in order to insure that due process is not violated by the injection of arbitrary factors into the jury's deliberations and to prevent a confusing or unmanageable series of mini-trials of unrelated and unadjudicated conduct during the sentencing hearing." Id., 608 So.2d at 955.
At the penalty phase of this trial, the state presented the testimony of twelve witnesses, eleven of which testified exclusively as to the Fontenot shooting.[32] Four eyewitnesses testified they saw the defendant shoot Jasper Fontenot. Other witnesses testified to the chain of custody of physical evidence recovered at the scene. Finally, the coroner testified as to Fontenot's cause of death. During this expert testimony, an autopsy picture of Fontenot was accepted in evidence.
Excepting the testimony of one witness who testified regarding the instant offense, the state produced no other evidence of the character of the defendant. In short, the state presented a prohibited "mini-trial" on the issue of the defendant's guilt or innocence of the killing of Jasper Fontenot.
It is important to remember the capital sentencing jurors must be able to weigh the fact that the defendant has not yet been judged guilty of the unadjudicated conduct introduced to show the defendant's character and propensities. With regard to this unadjudicated conduct, the defendant is entitled to a presumption of innocence which cannot be overcome except by a finding of guilt by a jury whose sole province is the defendant's guilt or innocence for that offense. In order to preserve this presumption of innocence to which the defendant is entitled, the capital jury may only consider that the defendant has been connected with the unadjudicated criminal conduct.
In the penalty phase of this case, the state introduced four eyewitnesses to the Fontenot shooting who testified to what they saw, multiple law enforcement officers who testified about the evidence gathered and its chain of custody, and the coroner who testified about Fontenot's cause and manner of death. This evidence went far beyond the mere showing of the existence of an allegation of criminal conduct which the capital jurors could consider in its evaluation of the defendant's character and propensities and instead attempted to prove the defendant's culpability for this unadjudicated crime beyond a reasonable doubt.
Introduction of evidence beyond that necessary to show criminal conduct has been committed and that the defendant has been accused of or connected to that criminal conduct, as well as some minimal evidence in support of these allegations, impermissibly shifts the focus of a capital sentencing jury from considering the character and propensities of the defendant to a determination of guilt or innocence of the unadjudicated criminal conduct.
We cannot say the jury's focus, which should have been narrowed to a determination of the appropriate penalty for this first degree murder, was not shifted to a determination of the defendant's guilt in the Fontenot shooting. Thus, we find an arbitrary factor was injected into the jury's sentencing determination which invalidated the jury's subsequent recommendation of the penalty of death. Due to this finding, we need not consider the defendant's remaining assignments of error regarding the penalty stage of his trial.

*249 CONCLUSION
For the foregoing reasons the defendant's conviction of first degree murder is AFFIRMED. The sentence of death is reversed and vacated and the case is remanded to the district court for a new sentencing trial. La.C.Cr.P. art. 905.1(B).
CONVICTION AFFIRMED; DEATH SENTENCE REVERSED AND VACATED; NEW PENALTY HEARING ORDERED.
DENNIS, J., concurs with reasons.
MARCUS, J., concurs in the affirmance of the conviction but dissents from the reversal of the sentence of death.
LEMMON, J., dissents in part and assigns reasons.
NOTES
[*] Pursuant to Rule IV, Part 2, § 3, Watson, J. was not on the panel which heard and decided this case. See the footnote in State v. Barras, 615 So.2d 285 (La.1993).
[1] Generally, assignments of error which have been neither briefed nor argued are considered abandoned. Consistent with this court's practice in death penalty cases, however, all assignments of error will be reviewed. See State v. Bay, 529 So.2d 845, 851 (La.1988) (and cases cited therein). Those assignments which have been briefed will be discussed in the main opinion; all others will be contained in an unpublished Appendix, which will remain a part of the record. The opinion will follow the order of the assignments of error as contained in the defendant's brief.
[2] Subsequent to this trial, Bourque was tried for and convicted of second degree murder for the killing of Jasper Fontenot. For purposes of this appeal, however, this court must only consider the defendant's status at the time of trial.
[3] Another witness, Cheryl Oberg, testified a shot went into the wall of the bar over the telephone. Both witnesses were correct. Evidence showed a round was fired into the floor and another round was fired into the wall by the telephone. See Vol. 17, pp. 4010, 4012.
[4] It should be noted the proper procedural vehicle in which to request removal of an assistant district attorney from prosecuting a case is a Motion to Disqualify. Recusation is a proceeding which is not applicable to the assistant district attorney. La.C.Cr.P. art. 680, Comment (a); State v. Fallon, 290 So.2d 273, 279 (La.1974).
[5] See No. 91-KD-9586, at 3.
[6] Defendant's argument that the statement also constitutes evidence of other crimes is addressed in Assignments of Error Nos. 26, 27.
[7] La.C.Cr.P. art. 230 provides "[t]he person arrested has, from the moment of his arrest, a right to procure and confer with counsel and to use a telephone or send a messenger for the purpose of communicating with his friends or with counsel."
[8] See Assignments of Error Nos. 1, 2, 3.
[9] See Assignments of Error Nos. 1, 2, 3.
[10] The defendant's trial, held almost one year after the Perry shooting, was expected by defense counsel to last through Easter 1991. Prospective jurors were questioned regarding this possibility during voir dire.
[11] During voir dire examination of a panel of prospective jurors, the prosecutor inquired:

Do you understand there is two ways for the defense of intoxication to come in? One is where it's involuntary, that is, where somebody may put something in somebody's drink without them knowing it. And the second one is if he says I'm voluntarily intoxicated, then the condition has to be to such a degree that you have to be convinced by a preponderance of the evidence that this person didn't know that he was committing the murder.
Vol. 6, p. 1353.
Defense counsel objected to the words "didn't know" and at a bench conference, the trial judge cautioned the prosecutor to use the terms "have the requisite specific intent." vol. 6, p. 1355.
[12] Vol. 9, p. 2095.
[13] Although defense counsel's objection comes after the court's questioning of Mr. George, the record seems clear the court was contemplating the same action for both. Vol. 14, pp. 3420-27.
[14] By this motion, the state also notified the defense of its intent to introduce evidence of the Fontenot shooting in the penalty phase of trial to show the defendant's character and propensities.
[15] Vol. 15, p. 3648, 3655 (testimony of Ian Robinson); Vol. 15, p. 3699 (testimony of Officer Reggio).
[16] LSA-R.S. 15:450 provides "[e]very confession, admission or declaration sought to be used against any one must be used in its entirety, so that the person to be affected thereby may have the benefit of any exculpation or explanation that the whole statement may afford."
[17] It also appears the state may have tried to withdraw the motion in limine and to just proceed with the statements. Vol. 4, p. 989.
[18] The defense filed a motion in limine seeking to exclude all evidence of the shooting of Mrs. Stoute. In a pretrial hearing on the matter, the trial court denied the motion. Vol. 5, pp. 1019-22.
[19] La.C.Cr.P. art. 729.5 provides in pertinent part: "If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this Chapter or with an order issued pursuant to this Chapter, the court may order such party to permit the discovery or inspection, grant a continuance, order a mistrial on motion of the defendant, prohibit the party from introducing into evidence the subject matter not disclosed, or enter such other order, other than dismissal, as may be appropriate."
[20] It is unclear whether this issue would be subject to harmless error analysis. In Jackson, this court found the harmless error doctrine applicable in reviewing a prosecutor's indirect comment on a defendant's failure to testify. Id., 454 So.2d at 118. In Johnson, the court questioned whether such an analysis is appropriate where the statutory rule mandates a mistrial where an improper reference has been made. We need not decide the issue here since we find no error was made. We note, however, the proper analysis is "not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error." Sullivan v. Louisiana, ___ U.S. ___, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993) (emphasis in original).
[21] At the time of the offense, second degree kidnapping was not one of the enumerated felonies which constituted a first degree murder under LSA-R.S. 14:30(A)(1). Since that time, second degree kidnapping has been added to the list. See Acts 1990, No. 526, § 1, effective September 7, 1990.
[22] See also State v. Stewart, 458 So.2d 1289, 1291 (La.1984).
[23] See Assignments of Error Nos. 19, 20, 21, supra.
[24] Defense counsel did object to the statement "while the State must prove guilt beyond a reasonable doubt, it does not have to prove guilt beyond all possible doubt," and requested it be deleted. Vol. 16, 3834.
[25] Vol. 16, p. 3892.
[26] Joseph, Lamonica, and Johnson, Louisiana Jury Instructions, Criminal-Civil (1980).
[27] Joseph and Lamonica, Louisiana Judges' Benchbook, Vol. I, Jury Instructions-Criminal, 3.6 (1985).
[28] As noted in Jackson, the trial judge may schedule this hearing either prior to trial or outside the presence of the jury during the course of the trial. Jackson, 608 So.2d at 955 n. 8.
[29] The defendant's trial was held over one month later, from March 18-28, 1991.
[30] As to the type of information a jury may consider in the sentencing portion of a bifurcated procedure, the Supreme Court has held it is a constitutionally indispensable requirement in a capital case that the sentencing authority consider "the character and record of the individual offender and the circumstances of the particular offense." Woodson v. North Carolina, 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976).
[31] This Capital Sentence Review is generally accomplished after all the defendant's assignments of error are reviewed and found to lack merit. In this case, a finding that an arbitrary factor was injected in the penalty phase negates the necessity for further review of the defendant's additional assignments of error in the penalty phase.
[32] The only witness not to testify about the shooting in Vermilion Parish was Deputy Suire, who investigated the Perrys' complaint against the defendant on March 17, 1990.